FILED
2012 Sep-28  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| **AUDREY BROUSSARD-WADKINS,** *et al.*, | ) ) ) |
| **Plaintiffs,** | ) ) |
| **vs.** | ) **Civil Action No. CV-09-S-1563-NE** ) |
| **WADE MAPLES,** *et al.*, | ) ) |
| **Defendants.** | ) |

## TABLE OF CONTENTS

I.     OVERVIEW OF CIVIL REMEDIES UNDER RICO . . . . . . . . . . . . . . . . . . . . . . . .     4

II.    MOTION TO STRIKE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

       A.     Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

       B.     Expert Report of Edward Mallon . . . . . . . . . . . . . . . . . . . . . . . . . .     9

              1.   Mallon's methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

              2.   Mallon's opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

              3.   The admissibility of Mallon's opinions. . . . . . . . . . . . . . . . . . . . .     16

                   a.   Speculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

                   b.   Specific opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

                        i.    Opinion regarding unauthorized workers. . . . . . . . . . . . .     21

                        ii.   Opinion regarding attestation on I-9 Forms . . . . . . . . . . .     25

                        iii.  Opinion regarding knowingly hiring illegal
                              immigrants . . . . .     27

                   c.   Conclusions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

       C.     Expert Report of Dr. George Borjas. . . . . . . . . . . . . . . . . . . . . . . . .     28

              1.   Dr. Borjas's qualifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

**2.   Methods used by Dr. Borjas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    **a.   Autonomy of Maples Industries in setting wages** . . . . . . . . . . 31

    **b.   Impact of labor supply on the wage scale of<br>Maples Industries** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    **c.   Conclusions and calculation of damages** . . . . . . . . . . . . . . . . 38

**3.   Reliability and admissibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    **a.   Incompleteness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    **b.   Reliability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        *i.*   **Market power analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        *ii.*   **Hispanic school enrollment** . . . . . . . . . . . . . . . . . . . . . . . 44

        *iii.*   **Alternative causes and conflict with Dr. Borhas's<br>academic publications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**III**.   **MOTION FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

  **A**.   **Relevant Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    **1.   Maples Industries and defendants** . . . . . . . . . . . . . . . . . . . . . . . . . 53

    **2.   Plaintiffs and other hourly employees** . . . . . . . . . . . . . . . . . . . . . 55

    **3.   Hiring hourly-wage employees** . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    **4.   Fraudulent documents and unauthorized workers** . . . . . . . . . . . 62

    **5.   Wages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    **6.   Immigration enforcement at Maples Industries** . . . . . . . . . . . . . 67

  **B**.   **Discussion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    **1.   The INA "hiring provision"** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

        **a.   Plaintiffs' attack on Mateo's credibility** . . . . . . . . . . . . . . . . 73

        **b.   Plaintiffs' "common sense" arguments** . . . . . . . . . . . . . . . . . 77

2.   The "attestation provision" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

a.   Compliance with the verification provision . . . . . . . . . . . . . . .   85

i.   Statutory interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

ii.   Application of the statute to the facts in the record. . . . .   89

b.   Compliance with the attestation provision . . . . . . . . . . . . . . .   93

c.   Damages and proximate cause . . . . . . . . . . . . . . . . . . . . . . . . .   96

IV.   CONCLUSION AND ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

# MEMORANDUM OF OPINION

Plaintiffs, Audrey Broussard-Wadkins and Darlene Harbin, were hourly-wage employees of Maples Industries, Inc.  They commenced this putative class action against the owners and officers of that company: *i.e.*, Wade Maples, John Maples, Howard Moore, and Gina Mateo.[1]  Plaintiffs allege that defendants conspired to depress the wages of hourly employees of Maples Industries by knowingly hiring immigrants who had been brought into the United States illegally, and by falsely attesting to the validity of employment documents in violation of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 *et seq.*

---

[1] *See* doc. no. 1 (Complaint) ¶¶ 4-10.  Mark Maples initially was named as a defendant as well, but he was dismissed from the case on July 28, 2010.  Doc. no. 75 (Order Dismissing Fewer Than All Defendants).  Audrey Broussard-Wadkins married after the complaint was filed and adopted a hyphenated surname.  Doc. no. 78-20 (Audrey Broussard-Wadkins Dep., Dec. 29, 2009), at 46-47.

("RICO").[2]  Plaintiffs brought the action on behalf of themselves and all similarly situated persons:  *i.e.*, current and former hourly-wage employees of Maples Industries who are legally authorized to work in the United States.[3]  This opinion addresses three motions:  defendants' motion for summary judgment;[4] defendants' motion to exclude the reports of plaintiffs' expert witnesses, Edward Mallon and Dr. George J. Borjas;[5] and plaintiffs' motion for class certification.[6]

## I.  OVERVIEW OF CIVIL REMEDIES UNDER RICO

In addition to the criminal sanctions provided by RICO, *see* 18 U.S.C. § 1963(a),[7] Congress declared that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . ."  18 U.S.C. § 1964(c).  Section 1962 makes it illegal to participate in a RICO "enterprise" that engages in a "pattern of racketeering activities," or to "conspire" to do so.  18

---

[2] Doc. no. 1 (Complaint) ¶ 2.

[3] *Id.* ¶ 1.

[4] Doc. no. 66.

[5] Doc. no. 82.

[6] Doc. no. 67.

[7] 18 U.S.C. § 1963(a) provides, in part, that "[w]hoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment). . . ."  The statute also provides for extensive forfeiture sanctions.  *See id*. §§ 1963(a)(1) – (a)(3).

4

U.S.C. § 1962(c)-(d); *see also Beck v. Prupis*, 529 U.S. 494, 506 (2000) (stating that, to prove a violation of the conspiracy provision, 18 U.S.C. § 1962(d), a plaintiff must show that the defendants (1) knowingly and willfully joined a conspiracy (2) with the purpose of violating 18 U.S.C. § 1962(c)).

To establish the requisite "pattern of racketeering activity," a plaintiff must demonstrate the "commi[ssion] of at least two distinct *but related* predicate acts." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292 (11th Cir. 2010) (alteration and emphasis supplied) (quoting *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006)).  Although the minimum number of predicate acts necessary to establish a "pattern" is two, the mere existence of two acts does not automatically satisfy the pattern requirement; instead, the acts must be, as stated in *Edwards*, *supra*, "related."  *Id.*

Further, a "pattern" of racketeering activity can be established by showing repeated violations of the same predicate offense. *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1397 (11th Cir. 1994) (finding a pattern of racketeering activity on the basis of repeated violations of the same bribery provision).  In this case, one predicate act that plaintiffs claim defendants (or their co-conspirators) committed is the repeated violation of § 274 of the Immigration and Nationality Act ("INA"), which is codified at 8 U.S.C. § 1324, and which is defined

5

in RICO as a predicate act, but only if plaintiffs can prove that the violations were for financial gain.  *See* 18 U.S.C. § 1961(1)(F).

Specifically, plaintiffs claim defendants conspired to violate 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to "knowingly hire[] for employment at least 10 individuals with actual knowledge" that those individuals were illegal aliens who had been brought into the United States illegally.  8 U.S.C. § 1324(a)(3)(A) (alteration supplied); *see also Edwards*, 602 F.3d at 1292-94, 1297-1300 (interpreting that provision in the RICO context).

Additionally, plaintiffs claim that, to facilitate that hiring, defendants conspired to have defendant Gina Mateo violate 18 U.S.C. § 1546(b)(3), which makes it a federal crime to use "a false attestation . . . for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act . . . ."  18 U.S.C. § 1546(b)(3).

"RICO claimants . . . must [also] show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation."  *Williams,* 465 F.3d at 1283 (alteration supplied).  Plaintiffs' theory of damages is that defendants' alleged acts of knowingly hiring  illegal aliens (perpetrated in part through false attestation as to the validity of their identification documents) depressed their wages below what they otherwise would have earned,

resulting in lost income for plaintiffs and a realization of greater profits for defendants.[8]

## II.  MOTION TO STRIKE

Plaintiffs proffered the reports of two expert witnesses in opposition to defendants' motion for summary judgment.  Edward Mallon was presented as an expert on immigration matters, and offered opinions on the legal status of hourly-wage employees of Maples Industries and defendants' compliance with the attestation statutes.  Dr. George Borjas was touted as an economic expert, and his report serves as the basis for plaintiffs' causation argument.  Plaintiffs have offered no other evidence regarding causation, and they relied on Mallon's opinions in their arguments in opposition to summary judgment.  Thus, the court must rule on defendants' motion to strike those reports before it can consider the question of summary judgment.

### A.  Legal Standard

Federal Rule of Evidence 702, read together with the trilogy of Supreme Court opinions that led to the Rule's revision in 2011,[9] compels the district courts to perform a "gatekeeping" function when determining the admissibility of expert scientific and technical evidence.  *See, e.g., United States v. Abreu*, 406 F.3d 1304,

---

[8] Doc. no. 1 (Complaint) ¶ 2.

[9] *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th

Cir. 2004)).  "This function inherently requires the trial court to conduct an exacting

analysis of the foundations of expert opinions to ensure they meet the standards for

admissibility under Rule 702."  *Id.* (internal quotation omitted).

> [T]he objective of that requirement is to ensure the reliability and relevancy
> of expert testimony.  It is to make certain that an expert, whether basing
> testimony upon professional studies or personal experience, employs in the
> courtroom the same level of intellectual rigor that characterizes the practice
> of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  At a minimum, the

approved analytical matrix requires "the proponent of the testimony . . . [to] show

that:  (1) the expert is qualified to testify competently regarding the matters he intends

to address; (2) the methodology by which he reaches his conclusions is sufficiently

reliable; and (3) the testimony assists the trier of fact."  *Maiz v. Virani*, 253 F.3d 641,

665 (11th Cir. 2001) (alteration supplied).  Those three requirements can be satisfied

by demonstrating that "'(1) the testimony is based upon sufficient facts or data, (2)

the testimony is the product of reliable principles and methods, and (3) the witness

has applied the principles and methods reliably to the facts of the case.'"  *Hendrix ex*

*rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (quoting Fed. R.

Evid. 702).  "The inquiry . . . is a flexible one" because, in any given case, "[m]any

factors will bear on the inquiry, and . . . [there is no] definitive checklist or test."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993) (alterations supplied).  Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular . . . technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P.*, 609 F.3d at 1194 (internal quotation marks and alterations omitted).[10]

## B.  Expert Report of Edward Mallon

Edward Mallon is a former special agent of the Immigration and Naturalization Service ("INS"), and he was presented as an expert on immigration issues.  Mallon began his career with the INS in 1972.[11]  After completing a training course, he went

---

[10] Additional factors a district court may consider include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

> (2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

> (3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

> (4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amends. (internal citations omitted).

[11] Doc. no. 78-13 (Expert Report of Edward Mallon), at 1.

to work in the INS office in Chicago, "investigating a wide range of immigration violations."[12]  He conducted investigations of persons engaged in the business of smuggling of illegal aliens into the United States and, in furtherance of those investigations, he temporarily relocated "to the Southwestern United States border areas on many occasions."[13]  In 1985, he was promoted to a supervisory position, and organized a "fraudulent document task force, which identified, investigated and prosecuted counterfeiters and vendors of fraudulent immigration documents."[14]  In 2003, his duties changed again, and he "supervised the investigation and prosecution of individuals and organizations involved in smuggling and transporting aliens into the United States."[15]  He retired in October of 2004.[16]  The body of Mallon's report is divided into three sections.  The first of those sections is titled "Illegal Immigration Overview."  In that section, Mallon describes the process by which people enter the United States illegally.  Mallon states that the majority of those who enter the country illegally do so by crossing the boarder between the United States and Mexico, and that they require and receive assistance in doing so.[17]  Mallon does not cite any

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 2.

[16] *Id.*

[17] Doc. no. 78-13 (Expert Report of Edward Mallon), at 2-3.

authority for that assertion; presumably it is based upon personal knowledge acquired during his experience working for the INS.  Mallon also does not indicate whether that section of his report is simply an illustration of the information that serves as the basis underlying his ultimate opinions, or whether it is meant to serve as an expert opinion unto itself.   The other two sections of Mallon's report are titled "Methodology of Review" and "Opinion/Analysis" and, as their names suggest, they fit more neatly into the expert report paradigm.

### 1.   Mallon's methods

To prepare his report, Mallon reviewed a sampling of personnel files obtained from Maples Industries.  Mallon was provided a hard drive containing the files of roughly 3,700 hourly-wage workers hired during the class period; but, due to time constraints, he reviewed only 840 of those files.[18]  He initially intended to examine all of the files; consequently, starting at the beginning of the alphabet, he began examining each file.[19]  After reviewing the first 150 files, however, Mallon changed his approach and reviewed only every fifth file of the remaining 3,550 files in order to save time.[20]  Each file contained a Department of Homeland Security Form I-9,

---

[18] *Id.* at 3, 6.  Thus, he examined the files of roughly one-fifth of the hourly employees.  The "class period" is the period within the four-year statute of limitations — that is, the four years preceding the date on which the complaint was filed: *i.e.*, Aug. 4, 2005 to Aug. 4, 2009.  *See* doc. no. 1 (Complaint) ¶ 1.

[19] Doc. no. 78-13 (Expert Report of Edward Mallon), at 3.

[20] *Id.*

"copies of supporting documents," and an application for employment.[21] It is unclear whether the copies of the documents in each file were in color. His review of each file began with the Form I-9 contained therein.[22] Mallon's Form I-9 analysis consisted of determining what type of work authorization the employee claimed to have (*e.g.*, citizenship or legal permanent residence), examining photocopies of the documents submitted to prove identification and authorization, and reviewing "the handwriting and ink color" on the Form I-9 for consistency "with the form having been completed by the employee and reviewed and verified by the personnel official."[23]

After reviewing the Form I-9, Mallon examined the corresponding application for employment.[24] He determined where the employee's Social Security card had been issued.[25] He also looked at employment and residential history to determine where the employee had lived.[26] He viewed the employee's educational background as

---

[21] *Id.*

[22] *Id.* For a detailed discussion of the Form I-9, see Part III(C)(2)(a), *infra*.

[23] Doc. no. 78-13 (Expert Report of Edward Mallon), at 3.

[24] *Id.*

[25] *Id.* The Social Security Administration allots a range of numbers to each state or territory to assign, so the number assigned to an individual is indicative of the issue location. *See* doc. no. 78-16 (Appendices to Expert Report of Edward Mallon) at App'x 2 (Social Security Number Allocations).

[26] Doc. no. 78-13 (Expert Report of Edward Mallon), at 3.

12

being "[o]f particular importance."[27]  Finally, he examined handwritten notes on some of the applications, which were "obviously completed by a personnel officer of the company."[28]  For each personnel file examined, Mallon "looked "for inconsistencies that would be pertinent in determining whether . . . employees of [Maples Industries] knowingly hired aliens not authorized to work in the United States."[29]  He compared the information the employee provided on his or her application to the documents submitted when the Form I-9 was completed; and when the information was inconsistent, he concluded that the employee presented false documents, and was not authorized to work in the United States.

In making those determinations, Mallon relied on experience and knowledge gained while working for INS.  He noted that many employees had Social Security numbers assigned to Puerto Rico, but their educational background was not consistent with Puerto Rican compulsory education laws.[30]  Mallon stated that, in his experience working for INS, it was common for illegal aliens to claim Puerto Rican birth.[31]  Another common scenario that he considered inconsistent with legal status was the large number of employees who were supposedly born in the United States, but

---

[27] *Id.* (alteration supplied).

[28] *Id.*

[29] *Id.* at 4 (alteration supplied).

[30] *Id.*

[31] *Id.*

educated in Mexico, Guatemala, or elsewhere in Central America.[32]  Mallon noted

that none of the purportedly American-born, foreign-educated employees presented

a birth certificate, in contrast to many of the American-born, American-educated

employees, who did present birth certificates.[33]  In addition to the criteria outlined in

more detail in his report, Mallon based his conclusions "upon easily obtainable public

information, [and] a common sense approach used in reviewing the documents."[34]

## 2.  Mallon's opinions

Mallon concluded that, of the 840 employees whose personnel files he reviewed,

139 (16.547%) "were unauthorized to work in the United States."[35]  He concluded

that the human resources personnel of Maples Industries had "knowingly hired aliens

who were unauthorized to work in the United States."[36]  He concluded that those

human resources personnel had "falsely certified I-9 Forms," because "[i]t was

apparent that the Certification Section was signed at a different time than the Review

Section was completed.   Therefore, the certifying official was not personally

---

[32] Doc. no. 78-13 (Expert Report of Edward Mallon), at 4-5.

[33] *Id.*

[34] *Id.* at 6 (alteration supplied).

[35] *Id.*  In his report, Mallon actually stated that 140 of the employees were unauthorized, but one of the workers he identified as illegal actually was hired prior to the class period.  Thus, the court will treat his report as concluding that 139 of 840 workers were illegal, rather than 140 of 841.  *See* doc. no. 78-18 (Lance V. Oliver Decl.) ¶ 2 & n.1.

[36] Doc. no. 78-13 (Expert Report of Edward Mallon), at 6

reviewing the documents as required by law."[37]

Mallon's report also contains statements that could be characterized as opinions or conclusions, although he did not label them as such.  In his "Illegal Immigration Overview," for example, Mallon stated that the persons "analyzed in this report fall into the category of those who illegally entered the United States."[38]  He provided no explanation of how he reached that conclusion, and it is unclear whether it is his expert opinion based on a review of the evidence, or a starting point, based on his experience, from which he analyzed the personnel files.  Immediately after stating that the employees being reviewed in this case entered the country illegally, Mallon explained the general process by which aliens receive assistance in crossing the border and finding employment.[39]  He did not explicitly opine that the Maples Industries employees whose files he reviewed received assistance in crossing the border, although that conclusion is strongly implied.[40]  Notably, despite his conclusion that defendants were knowingly hiring illegal aliens, he never stated that they did so with knowledge that those illegal aliens received assistance in crossing

---

[37] *Id.* (alteration supplied).

[38] *Id.* at 2.

[39] *Id.* at 2-3.

[40] The description of the assistance illegal aliens often receive follows shortly after his statement that the individuals studied in the report entered the country illegally.

the border.[41]   Finally, in reference to the handwritten notes listing place of birth on some of the employment applications, Mallon wrote "[i]t could be concluded that the personnel officer added these notations to justify hiring an applicant whose work authorization was in doubt."[42]

### 3.  The admissibility of Mallon's opinions

#### a.  Speculation

Defendants first make a general argument that Mallon's report "is fraught with unsupported, speculative statements."[43]  "*Daubert* requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury.  The trial court must 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Defendants point to two examples of what they characterize as "rank speculation."[44] The first is Mallon's statement that the illegal immigrants analyzed in the report entered the country illegally, rather than, for example, entering legally and

---

[41] The importance of this distinction is discussed in Part III(C)(1) of this opinion, *infra*.

[42] Doc. no. 78-13 (Expert Report of Edward Mallon), at 4 (alteration supplied).

[43] Doc. no. 83 (Brief in Support of Motion to Strike), at 9.

[44] *Id.* at 10.

overstaying a visa.[45]   Indeed, Mallon has offered no evidentiary support for that conclusion, which appears in the "Illegal Immigration Overview" section of the report, a section that seems to draw upon his general knowledge and experience, and not the facts of this particular case.

Defendants argue that Mallon's knowledge about illegal immigration is not applicable to this case because it is "limited to aliens 'apprehended for being in the United States illegally.'"[46]   Thus, they argue, he has no basis for rendering opinions regarding the immigration status of those who have not been apprehended, such as the Maples Industries employees at issue in this case.  Such an argument is absurd on its face.  Mallon's experience as an INS officer renders him capable of offering opinions on the general patterns of illegal immigration.  *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amends. ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony. . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  *Cf. United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing

---

[45] *Id.* at 9-10.

[46] *Id.* at 10 (quoting doc. no. 78-13 (Expert Report of Edward Mallon), at 2).

17

alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.") (emphasis in original).   The fact that Mallon's experience is necessarily limited to those who have been apprehended does not render his opinions on general illegal immigration patterns unreliable.  Rather, those opinions are within the scope of the experience gained during his lengthy career in immigration enforcement.

To the extent that general experience with illegal immigration is relevant to the facts in this case, Mallon is qualified to offer expert opinions on that subject.  Even so, and even though an expert's conclusion may superficially appear relevant to and helpful in the determination of facts at issue, it may ultimately prove unhelpful if it is too far divorced from the underlying data.

> [T]he Supreme Court has noted that, in the context of this analysis, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Although experts "commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*[47]  Rather, the trial court is free to "conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id.*

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010)

(alteration supplied); *see also, e.g.*, *McDowell*, 392 F.3d at 1301-02 ("[A]n expert

---

[47] "*Ipse dixit*," Latin for "he himself said it," refers to something asserted but not proved.  *See Black's Law Dictionary* 847 (9th ed. 2009).

opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions . . . .") (alteration supplied).  If an expert's facially relevant conclusion relates to the data it purports to rely upon only by his own assertion, it ultimately is simply an argument, "offer[ing] nothing more than what lawyers . . . can argue in closing arguments" and, consequently, fails to meet Rule 702's "helpfulness" requirement.  *Frazier*, 387 F.3d at 1262 (alteration supplied).

Indeed, Mallon has provided no connection between his conclusion that the immigrants covered in his expert report entered the country illegally and the data underlying his analysis.  Plaintiffs point to the table outlining Mallon's conclusion about each individual employee as evidence for such a connection, but nothing in that table addresses the issue of *entering* the United States.[48]  Mallon seems to have arrived at his "expert opinion" that the employees examined in the report entered the country illegally by combining his background knowledge that most illegal immigrants enter the country that way with his opinion that some of the employees are illegal.  That connection relies entirely on Mallon's own assertion.  Even though Mallon explained how his experience with the INS informed his opinions about which employees were illegal, he did not do so regarding their illegal entry.  *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amends. ("If the witness is relying

---

[48] *See* doc. no. 87 (Brief in Opposition to Motion to Strike), at 11 (stating that defendants "ignore altogether in their motion" the table of employee data in Mallon's report).

solely or primarily on experience, then the witness must explain how that experience is a sufficient basis for the opinion, and *how that experience is applied to the facts*.") (emphasis supplied).

Defendants' second example of speculation is more troubling. Mallon's comment that it "could be concluded" that human resources personnel were noting employees' places of birth to justify questionable hires *is* speculation, and it is presented in a misleading fashion. Plaintiffs argue that Mallon did not actually render an opinion — the "could be concluded" language implies that he did not reach that conclusion — but that argument is unconvincing. Accepting Mallon's couched language would essentially allow him to inject an opinion in his report without providing a basis for it, because he did not affirmatively endorse that conclusion. In plaintiffs' view, it is not a conclusion based on speculation; instead, it is essentially speculation offered without a firm conclusion. Even if that is so, it is no better. An expert report is no place for speculation, and by implying an opinion without actually labeling it an "opinion," Mallon appears to be trying to circumvent the requirement that all opinions must be based on the application of reliable methodology to the evidence reviewed by the expert.

### b.   Specific opinions

#### i.   Opinion regarding unauthorized workers

The central opinion in Mallon's report, upon which all others are built, is that 139 of the 840 employees whose personnel files Mallon reviewed were not authorized to work in the United States.  Defendants argue that Mallon improperly chose the data on which he based his opinion, and that his methodology in examining that data was unreliable.

Defendants also attack Mallon's methodology by asserting that "the 'data' that supports [*sic*] Mallon's Report is [*sic*] an incomplete set of employment records chosen in a non-random way."[49]  Defendants argue that, by reviewing every fifth file in the record, after initially reviewing the first 150 files, Mallon selectively chose his data.  *See In re Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (excluding as unreliable the testimony of an expert who "selectively chose his support from the scientific landscape") (internal quotation marks and citation omitted).  Indeed, Mallon's method of selecting the files for review does not exactly square with the description plaintiffs provided via citation to a statistics treatise.[50]

---

[49] Doc. no. 83 (Brief in Support of Motion to Strike), at 11.

[50] Plaintiffs state that Mallon used a technique called "systematic sampling" to select which files to review. Doc. no. 87 (Brief in Opposition to Motion to Strike), at 14.  That process is described in the statistics treatise as follows:

Perhaps it would have been preferable for Mallon to have selected all the files he reviewed in the same manner, or to have hewn more closely to a generally-accepted statistical sampling technique. Even so, the sampling method he used cannot reasonably be characterized as "selectively choosing" evidence that would be more favorable to plaintiffs, and is distinguishable from that which the Southern District of New York found objectionable in the *Rezulin* case. *See id.* ("In this case, the plaintiffs' experts have ignored a large amount of information that calls many aspects of the silent injury theory into question."). Rather than deliberately ignoring information detrimental to plaintiffs' case, it appears that Mallon selected his sample from among the many files presented to him in an objective manner. That is, there is no indication that the manner in which he selected the files to review created any bias in favor of plaintiffs. Although the starting point from which he began reviewing every fifth file was not truly random,[51] there is no evidence suggesting that it was intentionally chosen to skew the results in favor of plaintiffs. Moreover, it is unclear

---

Systematic sampling draws only the first number randomly. Then, each of the other subjects are [*sic*] drawn according to some predetermined plan, such as every tenth person. This sampling technique is usually used when there is a large sample to be drawn as it saves time.

Isadore Newman, Carole Newman, Russell Brown & Sharon McNeely, *Conceptual Statistics for Beginners* 6 (Lanham, Md.: University Printers of America, 3d. Ed. 2006). Mallon did not "randomly" select *the first file*, as he reviewed 150 files consecutively before switching to every fifth file. Thus, the file that became "first" for the purposes of systematic sampling every fifth file was the last of the files he examined sequentially.

[51] *See* note 50, *supra*.

22

how it *could* have been chosen for the purposes of skewing the results; Mallon simply selected every fifth file from a list arranged alphabetically (albeit, after reviewing the first 150 sequentially).  Further, defendants have offered no explanation or argument as to how the starting point for that process could or did result in an inaccurate or unrepresentative set of data that favored the plaintiffs' arguments.

Defendants also argue that Mallon's use of the personnel files to determine immigration status was improper in and of itself.  They note that he did not interview anyone in conducting his investigation, relying entirely on paper evidence, including photocopies of identification and employment verification documents, to reach his conclusions.[52]   Additionally, defendants argue that Mallon's methodology is unreliable because it was developed for this litigation.  Those arguments are unavailing.  Mallon's methodology involved a comparison of the information in employment applications, documents provided by employees, and unquestionably reliable outside sources, such as a list of immigration status codes and the geographical distribution of Social Security numbers.  Although developed specifically for this litigation, Mallon's method of searching that information for inconsistencies is not otherwise unreliable.  By all indications, the method was derived directly from his extensive experience in the immigration enforcement field.

---

[52] Doc. no. 83 (Brief in Support of Motion to Strike), at 15-16.

23

Further, Mallon's reliance solely on documentary evidence (including photocopies), rather than interviews, does not undermine the reliability of his method. He has decades of experience as an INS investigator, including almost two decades running a document fraud task force. His determinations of falsity were usually based on inconsistent information between applications and identification documents within the same personnel file. For that type of determination, examining the original identification documents would offer no advantage over examining photocopies, except in those instances where a conclusion could be based on the color of inks and the depth of indentations made by the putative author. Although interviewing employees may have allowed them to explain discrepancies in their documentation, many of the problems were of the type that could not possibly be explained away: *e.g.*, a person claiming to be born in 1983 claiming to have entered the country using an immigration code indicating that he was allowed entry to perform seasonal agricultural work in 1986.[53] Mallon's opinion that 139 of the personnel files he examined indicated that the employee in question was not authorized to work in the United States is sufficiently reliable to satisfy Rule 702.

---

[53] Doc. no. 78-13 (Expert Report of Edward Mallon), at 5.

### *ii.* Opinion regarding attestation on I-9 Forms

Defendants attack Mallon's consultation of the personnel files, as a whole, to

determine whether the certification section of the Department of Homeland Security's

Form I-9 was properly completed.  Defendants argue that Mallon's approach brings

in more information than human resources employees are required to consult in

completing that Form.  To the extent that Mallon uses information contained in the

applications to conclude that the I-9 Forms were falsely attested, the method is not

reliable.  As will be discussed in Part III(C)(2)(a)(*i*) of this opinion, *infra*, the

employer's representative responsible for completing an  I-9 Form is not required to

engage in the same type of searching inquiry that Mallon performed.  Thus, to rely

on information that would be outside the scope of the I-9 process when attempting

to determine whether that process was lawfully conducted is not proper.

Additionally, in reaching his conclusion that the human resources employees

completing the I-9 Forms were doing so in violation of the law, Mallon relied on the

fact that the verification and certification sections were completed in different

handwriting or different color ink.[54]  From that he concluded that the sections were

filled out at different times and, therefore, that "the certifying official was not

_____

[54] *Id.* at 6.

personally reviewing the documents as required by law."[55]  That conclusion does not necessarily follow from the premises, and demonstrates the flawed methodology underlying Mallon's opinion regarding the completion of the I-9 Forms.  Assuming, *arguendo*, that Mallon was correct in determining that the sections were filled out at different times, that timing would in no way prove that the certifying official did not personally inspect the documents.[56]

Thus, the methodology underlying Mallon's opinion that the I-9 Forms were falsely completed is flawed in two ways.  First, he relied on information outside the scope of the Form I-9 verification procedure; and, he concluded that defendant Gina Mateo must have falsely attested, because that extra information indicated that many employees were unauthorized.  Second, he made the logically unsound leap from the conclusion that a Form I-9 was not fully completed at one time to the conclusion that the person completing the form could not have personally reviewed the documents.  For those reasons, his opinion regarding false attestation is unreliable and due to be stricken.

---

[55] *Id*.

[56] In fact, the other evidence in the record indicates that Mateo pre-signed the forms, *and* that she made at least a cursory inspection of the documents.  *See* Part III(B)(3) of this opinion, *infra*.  Pre-signing the forms, although improper, does not preclude the possibility of inspection of the documents.

### *iii.* Opinion regarding knowingly hiring illegal immigrants

Mallon also opined that human resources personnel employed by Maples Industries "knowingly hired aliens who were unauthorized to work in the United States."[57] The parties' arguments regarding that opinion are entirely devoted to its helpfulness to the jury. However, before the court can inquire as to whether such an expert opinion would be helpful to a jury, it must first determine whether the opinion is reliable.

Mallon's opinion that illegal immigrants were *knowingly* hired is not reliable. He provides no factual basis or explanation for that opinion when he offers it at the end of the report. It appears to be a conglomeration of his two other opinions: that 139 of the 840 employees whose personnel files Mallon reviewed were not authorized to work in the United States; and, that Maples Industries personnel falsely attested on Forms I-9. As stated above, his methodology for reaching the latter opinion is not reliable. Thus, Mallon's conclusion that Maples Industries personnel *knowingly* hired illegal aliens must also be stricken.

### c.   Conclusions

In sum, Mallon's offered three significant opinions in his expert report, but only one of them satisfies the admissibility requirements for expert testimony. Thus, the

---

[57] Doc. no. 78-13 (Expert Report of Edward Mallon), at 6.

report will be admitted only to the extent that it relates to Mallon's opinion that 139 of the 840 employees whose personnel files were reviewed by him were not authorized to work in the United States.  Mallon's conclusions that defendant Gina Mateo was not properly completing the I-9 Forms, and that she was knowingly hiring illegal immigrants, are not based on sufficiently reliable methodology.

## C. Expert Report of Dr. George Borjas

Defendants also have moved to strike the expert report of Dr. George J. Borjas, plaintiffs' economic expert.  Rather than attacking Dr. Borjas's methodology or conclusions point by point, defendants focus on the fact that Dr. Borjas based his economic analysis on statistics derived from Mallon's report.

### 1. Dr. Borjas's qualifications

Dr. Borjas is a professor of economics and social policy at Harvard's Kennedy School of Government, and a research associate at the National Bureau of Economic Research.[58]  He earned his doctoral degree in economics in 1975, focusing his studies on labor economics and econometrics.[59]  He describes himself as a "labor economist" specializing in the "application of microeconomic theory, econometrics, and data analysis to labor market issues."[60]  He is a member of the Econometric Society and

---

[58] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 1.

[59] *Id.*

[60] *Id.*

of the Society of Labor Economists.[61]  He has published scores of scholarly articles, and has "published or edited several books specifically dealing with the economics of immigration."[62]

## 2.  Methods used by Dr. Borjas

Dr. Borjas used a series of statistical measures to evaluate the impact on plaintiffs' wages of defendants' alleged hiring of illegal aliens.  To conduct such an analysis, he necessarily had to begin with data on the number of illegal aliens Maples Industries actually employed.  For that number, he turned to Mallon's report, and it is his reliance on the Mallon report that forms the gravamen of defendants' motion to strike his report.

Defendants devote little attention to Dr. Borjas's report in their brief in support of their motion to strike.  They argue that Dr. Borjas's report must be stricken because it "is based <u>solely</u> on purported numbers of 'unauthorized' workers  (as defined by Mallon) <u>without any distinction</u> between those who allegedly were hired with the requisite actual knowledge or whose employment was in any way caused by false attestations."[63]  Defendants add little to this argument in their reply brief, simply

---

[61] *Id.*

[62] *Id.*

[63] Doc. no. 83 (Brief in Support of Motion to Strike), at 20-21 (emphasis in original).

stating that the "report does not meet the reliability requirements of *Daubert*."[64]  As discussed in the preceding Part of this opinion, Mallon's report is only partially admissible: that is, to the extent that it establishes that certain Maples Industries employees were illegal aliens.  It is those conclusions that Dr. Borjas took from the Mallon report and used as the basis of his analysis.[65]

Dr. Borjas began his report with a summary of existing economic theory and scholarship regarding the impact of immigration on wages.  He stated that, absent other factors, "an immigration-induced increase in the size of the workforce lowers the wage of competing workers."[66]  He cited one of his previously published academic articles, in which he concluded that there is a correlation between the type of skills possessed by immigrants and the wages paid in fields requiring those skills, and concluded that:  "wages during a particular decade grew slowest for those [types of workers] that experienced the largest increase in immigration."[67]  He stated that the methods used to measure wage impact on certain skill groups could be analogously applied to employees of a specific company.[68]  He also noted that, in some labor

---

[64] Doc. no. 89 (Reply Brief in Support of Motion to Strike), at 23.

[65] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶¶ 58-59.  Dr. Borjas actually limited his report to the data Mallon produced in his random sampling of employment files, ignoring the 150 files that were not randomly selected.  *Id.* ¶ 60

[66] *Id.* ¶ 9.

[67] *Id.* ¶ 10 (alteration supplied).

[68] *Id.* ¶ 11.

markets, certain companies have "market power" that allows them to set wages independently of those offered by their competitors.[69]  His analysis of the impact of immigration on wages focused on "wage elasticity," a term that he defined as "the responsiveness of wages to an immigration-induced increase in the supply of labor."[70] Dr. Borjas stated that he is "not aware of any conceptual difficulties that would prevent the application of these standard methodological approaches to the present case."[71]

### a.   Autonomy of Maples Industries in setting wages

Dr. Borjas considered information regarding employment in Jackson County and determined that Maples Industries is the largest manufacturer in the area, and the largest employer of unskilled labor.[72]  He stated that the approximately 2,000 workers employed at Maples Industries represent roughly 10% of the county's workforce.[73] In evaluating the impact of immigration on wages at Maples Industries, Dr. Borjas had access to wage and employment information regarding several of the other employers in the area.[74]  Dr. Borjas stated that the first step in the analysis was to

---

[69] *Id.* ¶ 13.

[70] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas)  ¶ 14.

[71] *Id.* ¶ 15.

[72] *Id.* ¶ 18.

[73] *Id.*

[74] *Id.* ¶ 19.

31

determine whether Maples Industries sets its wages according to the labor market, or whether it has some degree of autonomy in setting wages.[75]  To do so, he compared the wages paid to employees of Maples Industries to those offered workers at four other companies in the area, and to wage data compiled by the Census Bureau.[76]  Dr. Borjas had access to payroll data for Maples Industries for a ten-year period, from 2000 to 2009.[77]  He used that data to calculate three "wage trends" for Maples Industries employees:  the first based on hourly wages only ("straight-time wages"); the second based on hourly wages and overtime; and the third based on hourly wages, overtime, and bonuses combined.[78]

Dr. Borjas compared the three wage trends he created for Maples Industries with similar trends he had calculated for the four other companies that provided wage information.[79]  In each case, the comparison demonstrated wage growth at Maples Industries was slower than at the comparator firms.[80]  Dr. Borjas acknowledged "that the skill composition of the workforce may well differ across firms" and, thus, the differing wage trends may reflect differences in skill, rather than a Maples Industries

---

[75] Id.  ¶¶ 21-22.

[76] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶¶ 23-24.

[77] Id. ¶ 25.

[78] Id.

[79] Id. ¶ 27.

[80] Id. ¶¶ 27-31.

policy of stagnant wage growth.[81]  For that reason, Dr. Borjas also compared the wage trends at Maples Industries to those of low-skill workers in Alabama as a whole, in the combined Jackson-DeKalb County area in particular, and across non-metropolitan areas of Alabama.[82]  The results for the local area comparison were inconclusive, but when compared to the wages for low-skill workers in Alabama as a whole, and to those in the non-metropolitan areas of the state, the wages offered by Maples Industries were again found to be low.[83]  Dr. Borjas performed similar comparisons, with similar results, using the wage trends for low-skill Alabama workers in the manufacturing and textile mills industries, and low-skill textile mills workers in Alabama, Georgia, and Tennessee combined.[84]

Once Dr. Borjas had compared the raw data from Maples Industries and the comparator firms and geographic areas, he used that data to create a regression model for the purpose of determining the relationship between wages at Maples Industries and the comparators.[85]  In building this regression, Dr. Borjas used *time* as the independent (x-axis) variable, setting 0 at the year 2000, 1 at the year 2001, and so

---

[81] *Id.* ¶ 31.

[82] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 32.

[83] *Id.*

[84] *Id.* ¶ 33.

[85] *Id.* ¶ 34.

on through 2009.[86]  The dependent (y-axis) variable was "the difference between the log [*i.e.*, logarithmic] average hourly wage at Maples (the measure that includes overtime) and the log hourly wage in the comparator."[87]  In other words, for each comparator, he began with a series of points representing the difference in hourly wages in each year.  Then, using those established data points, he ran a linear regression to estimate a coefficient and y-axis intercept point for each comparator, essentially creating a trend line for each set of wage trends.  In each case, the coefficient represented the slope of the trend line: that is, the rate of change of the relationship between the Maples Industries wage and the comparator wage.  Dr. Borjas's linear regressions all have negative coefficients, ranging between approximately -0.01 and -0.02.[88]  That is, the regressions show "that wages at Maples grew by 1 to 2 percentage points less per year than the wage [scale] in the comparator firm or market."[89]

Dr. Borjas concluded that "the wage trends at Maples do not seem to resemble the wage trends observed in firms that may hire from the same pool of low-skill workers,

---

[86] *Id.*

[87] *Id.*  Dr. Borjas did not explain the purpose of using the logarithm of the hourly wage, rather than simply the average wage itself.  He similarly used logarithms in his analysis of wage elasticity. *Id.* ¶ 43.

[88] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 34.

[89] *Id.* (alteration supplied).  Dr. Borjas also performed the same procedure using a "fixed weight" methodology to account for changing job titles at Maples, with similar results.  *Id.* ¶ 35.

nor does it seem to resemble the wage trends observed in the overall market for low-wage labor in the state of Alabama."[90]  That evidence, he wrote, "seems consistent with the hypothesis that Maples has some degree of wage discretion."[91]  Dr. Borjas also considered documentary evidence and deposition testimony in determining that "it seems as if the Maples wage structure is set completely independently of what is the 'going wage' for the types of workers Maples wishes to attract, hire, and retain."[92]

### b.   Impact of labor supply on the wage scale of Maples Industries

Dr. Borjas next focused on wage elasticity at Maples Industries:  that is, the amount by which the wages paid by that company changed due to a shift in the supply of labor available to the company.[93]  Estimating the wage elasticity requires data on wages, the size of the workforce, and variations in size of the labor supply.[94]  In addition to the different measures of the average wage discussed above, Dr. Borjas used payroll data supplied by Maples Industries to calculate the total man-hours worked in each year.[95]  The final variable in the wage elasticity calculus is the immigration-induced increase in the size of the local workforce.  Dr. Borjas relied on

---

[90] *Id.* ¶ 36.

[91] *Id.*

[92] *Id.* ¶¶ 37-38.

[93] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas)  ¶ 40.

[94] *Id.* ¶ 41.

[95] *Id.* ¶ 44.

a Pew Research Center report for the proposition that the majority of unauthorized immigrants in Alabama are of Hispanic origin.[96]  He used the enrollment data for Hispanic children in the Jackson County and Scottsboro city schools as a proxy for the immigrant population in the area.[97]  Dr. Borjas noted that a working paper issued by the Federal Reserve Bank of Atlanta relied on that same methodology when estimating the illegal immigrant population of Georgia.[98]  Over the course of the ten-year period Dr. Borjas examined, enrollment of Hispanic students in the Scottsboro and Jackson County school systems tripled, while overall student enrollment remained steady.[99]

Using those three sets of values — wages, man-hours, and immigrant population — Dr. Borjas created another regression model.[100]  The regression produced a coefficient based on the wages paid and hours worked in each year.[101]  To calculate wage elasticity, that coefficient was analyzed in conjunction with the change in the size of the labor supply (again, measured using Hispanic school enrollment figures as a proxy).[102]  According to this methodology, changes in wages and man-hours are

---

[96] *Id.* ¶ 45.

[97] *Id.*

[98] *Id.*

[99] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas)  ¶ 46.

[100] *Id.* ¶ 49.

[101] *Id.* ¶ 50.

[102] *See id.* ¶ 51.

correlated with the labor supply only if that labor supply is truly available to the company: that is, if the company is willing to hire those workers.[103]   Thus, there would only be a correlation between Hispanic school enrollment numbers, on the one hand, and wages and hours, on the other, if Maples Industries was willing to hire the unauthorized immigrants represented by the increased school enrollment.[104]

Dr. Borjas ran the regression model using several different calculations of wages: "the straight-time hourly wage rate, the average hourly wage rate that includes overtime, the average hourly wage rate that includes both overtime and bonuses, and gross weekly pay (which includes overtime, but not bonuses)."[105]   The resulting wage elasticity ranged from -0.26 to -0.33, depending on the wage formula used.[106]   Those numbers indicate that a 10% increase in the size of the workforce is correlated with a 2.6% to 3.3% *decrease* in hourly wages.[107]   In contrast, there was a *positive* correlation between increased Hispanic enrollment and total man-hours worked, represented by an elasticity coefficient of +0.37.[108]   That is, if the number of Hispanic

---

[103] *Id.*

[104] *See id.*  Dr. Borjas's method also accounted for aggregate economic conditions.  Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 54.

[105] *Id.* ¶ 55.  Dr. Borjas also ran the regression using the "fixed weight" method to account for changing job titles and concentrations of workers in different roles within the Maples Industries workforce, with similar results.  *Id.* ¶ 56.

[106] *Id.* ¶ 55.

[107] *Id.*

[108] *Id.*

students enrolled in area schools increased by 10%, the total hours worked at Maples Industries would increase by 3.7%.[109]

Dr. Borjas also ran similar regressions with data from other local employers. The employment elasticity for each of two neighboring employers was within the standard error for each model, representing no significant correlation between Hispanic school enrollment and employment at those firms.[110] In other words, the model that shows a relationship between immigrant population and employment at Maples Industries "is not informative when applied to the study of wage evolution at two neighboring firms" — a fact that Dr. Borjas believes to be further evidence that "wage-employment trends at Maples differ significantly from those at some neighboring firms, suggesting the presence of some discretion in pay-setting decisions."[111]

### c.   Conclusions and calculation of damages

Having concluded that the hiring of illegal immigrants did cause wage depression, Dr. Borjas set out to calculate the extent of that negative impact. He used Mallon's report to determine how many illegal immigrants were hired in each year during the class period, and how many man-hours were worked by both legal and

---

[109] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 55

[110] *Id.* ¶ 57.

[111] *Id.*

illegal workers in each year.[112]   To calculate damages, Dr. Borjas first determined what percentage of the increase in man-hours in each year of the class period was due to the influx of unauthorized employees.[113]   That percentage was derived by dividing the total hours worked by illegal aliens in a given year by the total hours worked by legal workers already employed at the beginning of that year.[114]   The results of this calculation rose over the course of the class period, from 2.8% in 2005 to 16.2% in 2009.[115]   In other words, as Maples Industries added man-hours in each year, the extent to which that increase was attributable to the hiring of illegal immigrants also increased.   Using the -0.33 wage elasticity calculated above, Dr. Borjas determined the impact that the employment of illegal immigrants had on wages:  the increase in man hours attributable to illegal workers was multiplied by the wage elasticity to determine its impact on wages, and that product was multiplied by the total amount paid to authorized workers in order to calculate the impact that wage depression had on the putative class.[116]   The result was a total of roughly $4 million for the entire putative class of authorized workers, representing a wage reduction of 2.3%.[117]   Dr.

---

[112] *Id.* ¶¶ 59-60.  Dr. Borjas used only the randomly selected portion of Mallon's data, and multiplied the numbers by five to account for the one-fifth sample size.  *Id.* ¶¶ 59-60 & n.51.

[113] *Id.* ¶ 60.

[114] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 60.

[115] *Id.*

[116] *Id.* ¶ 64.

[117] *Id.* ¶¶ 7, 64.

Borjas also concluded that damages for the named plaintiffs, Audrey Broussard-Wadkins and Darlene Harbin, are $1,528 and $1,240, respectively.[118]

### 3.  Reliability and admissibility

Defendants devote very little of their briefs to Dr. Borjas's report, and the only argument they actually make is that Dr. Borjas relied on Mallon's report, which they argue is inadmissible.[119]  As noted above, to the extent that Dr. Borjas relied on Mallon's report, he used that portion of the report which this court finds reliable. Defendants did not depose Dr. Borjas, nor did they offer any expert testimony in rebuttal.  Although defendants do not substantively challenge the content of Dr. Borjas's report, other than his reliance on Mallon's report, the court still must determine whether the Borjas report satisfies the requirements of Rule 702 and *Daubert*.

This is not the first time this court has been presented with an expert report penned by Dr. George Borjas.  The attorneys who represent the plaintiffs in the present case brought another action based on the same theories underlying this case. *See Hall v. Thomas*, 753 F. Supp. 2d 1113 (N.D. Ala. 2010).  The plaintiffs in *Hall* presented a report written by Dr. Borjas that purportedly provided expert opinions on

---

[118] *Id.* ¶ 65.

[119] Doc. no. 83 (Brief in Support of Motion to Strike), at 20-21; doc. no. 89 (Reply Brief in Support of Motion to Strike), at 22-24.

the impact of the employment of undocumented immigrants at the Pilgrim's Pride poultry plant in Russellville, Alabama. *Id.* at 1118. This court ruled that Dr. Borjas's report was inadmissible, and due to be stricken from the record, because it was incomplete, was based in unreliable methods, and would not be helpful to a jury. Dr. Borjas's report in this case differs from that in *Hall*, in that some of the problems found in that case are not present here. Even so, some of the same problems remain.

### a.   Incompleteness

The first ground on which this court found Dr. Borjas's expert report inadmissible in *Hall* was that the report was "fatally incomplete." *Id.* at 1139. In that report, Dr. Borjas described the type of regression model that he performed in preparing his report for this case. However, he did not actually *perform* the regression in *Hall*. *Id.* at 1142. In preparing that report, Dr. Borjas ignored the data before him, which indicated that man-hours worked at the defendants' plant had actually *decreased* during the relevant time period. *Id.* at 1141. He asserted that that data must have been erroneous and used the plant's output, which had increased, as a proxy for man-hours worked. *Id.* During his deposition in *Hall*, he admitted that he had assumed that there had been no increase in automation at the plant during the relevant period, which could have increased production while reducing man-hours. *Id.* In fact, there *had* been an increase in automation. *Id.* Thus, in *Hall*, Dr. Borjas did not use the

41

correct data to perform the regression analysis central to his methodology.  Instead, he used a false assumption to circumvent the facts in the case, which did not fit neatly into his theory.  Finally, he concluded only that the increase in the labor supply in Russellville, caused by the influx of illegal immigrants, led to lower wages at the plant.  *Id.* at 1143.  He did not actually opine that the hiring of illegal immigrants *at the plant itself* caused lower wages.  *Id.*  For those reasons, this court determined that his testimony was merely *ipse dixit*, and would not be helpful to a jury.  *Id.* at 1142.

Here, Dr. Borjas *did* run the regression.  Nothing in the record suggests that the data on which he relied were incomplete or inaccurate.  Defendants did not depose him and, thus, any potential gaps in the data or false assumptions underlying the data have not been exposed.  For those reasons, the court will not strike Dr. Borjas's report on the basis of incompleteness, and will turn instead to an evaluation of the reliability of the report.

### b. Reliability

In addition to finding Dr. Borjas's report incomplete, this court's opinion in *Hall* found that it was not sufficiently reliable for three reasons:  his "market power" analysis was unreliable; his use of Hispanic school enrollment as a proxy for the presence of illegal immigrants in the labor force was unreliable; and he failed to account for possible alternative causes, in a departure from his own scholarship.  The

latter two flaws also are present in Dr. Borjas's report in this case.

### *i.* **Market power analysis**

In *Hall*, this court found Dr. Borjas's "market power analysis" unreliable for several reasons. Dr. Borjas simply compared the starting wages paid at the Pilgrim's Pride plant in Russellville with those paid by other employers in the same area, and determined that the plant paid a lower wage. *Id.* at 1148. In doing so, he ignored several other factors that could have contributed to the lower wage. He did not consider the fact that one of the comparator firms had a "deliberate policy" to set higher wages to attract the type of workers it desired. *Id.* He did not control for the fact that the poultry processing industry pays lower wages than other manufacturing industries on the national level, a factor that has been the subject of his own research. *See id.* at 1149 ("Dr. Borjas's own academic writing has emphasized the existence of inter-industry wage differentials within the manufacturing sectors, and posits multiple reasons why these differentials exist."). He admitted that he did not look into the factors that he himself stated were relevant to determining whether a firm has wage discretion. *Id.* Finally, the wage *trends* at the Russellville Pilgrim's Pride plant mirrored those at the comparator firms, even if the wages themselves were lower. *Id.* at 1150.

Dr. Borjas's analysis of Maples Industries as a company with market power does

not suffer from all of the same flaws.  There is no evidence that any of the comparator firms deliberately paid higher-than-market wages.[120]  Dr. Borjas accounted for regional and industry factors in analyzing the wage trends at Maples Industries.  That is, he not only used other local firms as comparators, but also compared wages at Maples Industries to those at other, similar, manufacturers.  Specifically, he used wage data for:  low-skill workers in Jackson and DeKalb Counties, combined; low-skill workers in Alabama as a whole; low-skill workers in non-metropolitan areas of Alabama; manufacturing employees in Alabama; and, textile workers in Alabama, Georgia, and Tennessee, combined.[121]  Unlike the wage trends in the *Hall* case, which were virtually the same for the comparator firms and the defendants' firm, the wage trend for Maples Industries contrasted with those of the comparator firms Dr. Borjas examined in this case.  Thus, Dr. Borjas's "market power" analysis in this case does not suffer from the same problems as the similar analysis he performed in *Hall.*

### ii.  Hispanic school enrollment

In the report he submitted in the *Hall* case, Dr. Borjas used the number of Hispanic students enrolled in Russellville schools as a proxy for the immigrant population in the area.  *Id.* at 1145.  In his deposition in that case, he admitted "that

---

[120] In fact, Dr. Borjas specifically excluded companies that paid substantially higher wages. Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 24 n.14.

[121] *Id.* ¶¶ 32-33.

the use of ethnic-breakdown school enrollment data in a study of this variety would be entirely novel." *Id.* He also admitted that he had not performed any test to determine the validity of using enrollment data as a proxy for immigrant population, and that his "whole method would fail" if that use were invalid. *Id.* at 1146. Dr. Borjas admitted that, in comparing increases in Hispanic school enrollment with depression of wages, he did not control for any other factors that may have influenced wages: *e.g.*, "changes in economic climate, demand for labor, changes in local hiring environment, or strategic corporate decisions." *Id.* at 1147. Finally, Dr. Borjas's theory in *Hall* was undermined by the fact that the total enrollment of Russellville schools remained static during the relevant time period: *i.e.*, regardless of the percentage of *immigrant* workers in the population, the *total* supply of workers remained the same. There was no "supply shock" created by an influx of immigrants that allowed the defendants to lower wages due to an abundance of workers. *Id.* at 1147.

Here, Dr. Borjas once again used Hispanic school enrollment as a proxy for the immigrant population.[122] In the report filed in the present case, Dr. Borjas stated that a "recent working paper issued by the Federal Reserve Bank of Atlanta" concluded that there is a correlation between Hispanic school enrollment and the employment

---

[122] *Id.* ¶ 45.

of illegal immigrants.[123]   He noted that the population of Hispanic students in the Scottsboro and Jackson County school systems increased dramatically over the class period, while the overall enrollment remained constant.[124]   Thus, the enrollment numbers on which he relied are comparable to those in *Hall*:   *i.e.*, an increase in Hispanic enrollment, combined with stagnant overall enrollment.   As in *Hall*, that change in enrollment does not definitively demonstrate any increase in the total number of workers available to hire.

Moreover, this court is not entirely convinced that the single working paper cited by Dr. Borjas is sufficient evidence of the reliability of the use of enrollment figures as a proxy for illegal immigrant employment.   In *Hall*, this court stated that "in light of the political and racial implications of a case of this variety, this court is not prepared to admit as reliable this novel use of Hispanic enrollment as a proxy for an influx of immigration."   *Hall*, 753 F. Supp. 2d at 1147.   Dr. Borjas's citation to a single paper does not eliminate the novelty of his method, and this court has the same qualms about its reliability as expressed in *Hall*.

---

[123] *Id.*

[124] *Id.* ¶ 46.

### *iii.* **Alternative causes and conflict with Dr. Borjas's academic publications**

Finally, this court in the *Hall* case determined that Dr. Borjas failed to adequately account for possible alternative causes for the decrease in wages at the defendants' Russellville plant.  First, the court noted that Dr. Borjas had previously applied his methodology on the *national* level only, and that its use was "entirely without precedent at the level of a single firm in a small rural town."  *Id.* at 1151.  In fact, Dr. Borjas "has been among the most stalwart critics of studies of the impacts of immigration on native wages done at geographic levels smaller than whole nations." *Id.*  In his academic literature, Dr. Borjas identified numerous economic factors that undermine the accuracy of studies of the impact of immigration on the local or regional level.  *Id.*  Yet he offered no explanation as to why he "chose[] to jettison [his] skepticism" for those studies in preparing his expert report for the *Hall* case.  *Id.* (alterations supplied).  He also did not account for factors specific to that case:  the wage decisions at the plant were the result of the policies of a nationwide corporation, and that corporation was in the midst of financial turmoil (and ultimately bankruptcy) during the class period.  *Id.* at 1152-53.

This court noted that, under Dr. Borjas's general theory on the impact of immigration on wages, which assumed that all unauthorized workers increase the

labor supply,

> wages at Pilgrim's Pride should fall if immigrants had moved into the area, even if Pilgrim's Pride had never hired a single one. Thus, the same decline in plaintiffs' real wages would occur even if the defendants had not committed the required predicate act — a fact that entirely eviscerates the assumption that the hiring (much less hiring with requisite knowledge) was the "but for" cause of plaintiffs' depressed wages.
>
> Any or all of these factors (and probably several more) could easily explain a diminution in wages; yet . . . Dr. Borjas would control for none of them and would, instead, attribute the entire diminution in wage to increased labor supply and then multiply that coefficient by the number of immigrants allegedly hired in violation of the INA.

*Id.* at 1153 (citation omitted).

Maples Industries is a local, family-owned firm that, as far as the record shows, was not in danger of bankruptcy during the class period.  Thus, the factors specific to the plant in the *Hall* case are not present here.  Yet the other problems with Dr. Borjas's report remain.  He has not reconciled the methods and conclusions of his report with those he set forth in his scholarship, as discussed in detail in *Hall*.  In the report Dr. Borjas submitted in the present case, he states that "there is nothing in economic theory or in the statistical methodology that prevents the estimation of the impact of immigration at the firm level."[125]  In support of that statement, he pointed to his own report in the *Hall* case, and a series of working papers issued by the

---

[125] *Id.* ¶ 20.

Federal Reserve Bank in Atlanta.[126]  He explained that single-firm studies had not been performed in the past because economists often lack access to firm-specific data.[127]  He stated that his scholarship on the impact of immigration on wages at the national level "does *not* necessarily imply that wage effects can only be measured at the national level."[128]

As this court stated in *Hall*, Dr. Borjas's own academic writing has stressed the importance of reviewing the economic impact of immigration on a *national* level.  *See Hall*, 753 F. Supp. 2d at 1151.  In those writings, he stated that "studies done at even the regional level . . . are '*completely uninformative*' and 'do not measure the impact of immigration on the native labor market.'"  *Id.* (quoting George Borjas, *Heaven's Door* 73-82 (1997)) (emphasis supplied).  He has written that, "'[b]ecause local labor markets adjust to immigration . . . the labor market impact of immigration may be measurable *only* at the national level.'"  *Id.* (quoting George J. Borjas, *The Impact of Immigration on the Labor Market* 7 (Conf. on Labor & Capital Flows in Eur., Jan. 2006)) (emphasis supplied).  He has written that, due to "the easy mobility of both capital and workers between geographic areas within the United States . . . 'immigration affects *every* city, not just the ones actually receiving immigrants.'"  *Id.*

---

[126] Doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 11.

[127] *Id.*

[128] *Id.* ¶ 13.

(quoting George J. Borjas, *The Labor Demand Curve* Is *Downward Sloping:*
*Reexamining the Impact of Immigration on the Labor Market*, 118 Q.J. Econ. 1335,
1338 (2003)) (emphasis in original).

Thus, Dr. Borjas's statement in his report that his writings do not suggest that a
reliable study cannot be conducted on a firm-wide level is, at best, a dramatic,
unexplained, about-face from the position he clearly stated in his published, peer-
reviewed writings.  At worst, it is a disingenuous gloss on that scholarship.  Although
it is certainly possible that Dr. Borjas has adopted a new line of thinking about the
study of the impact of immigration on the local level, nothing in his report
demonstrates the *reliability* of that new view.  In his writings, he stated that local
studies were not *informative*, because they did not account for mobility within a
country and other factors affecting local economies.  In his expert report, he ignored
that issue and, instead, said that single-firm studies had not previously been *feasible*
because data was not available.  Thus, his explanation did not actually address the
underlying problem he had identified in his academic writings.

If allowed to testify, Dr. Borjas would offer "expert" opinions that fly in the face
of the same scholarship on which plaintiffs rely to qualify him as an "expert" witness
in the first place.  In considering the admissibility of expert testimony, one of the
factors a court is to consider is "whether the theory or technique is generally accepted

by the relevant . . . community." *Hendrix ex rel. G.P.*, 609 F.3d at 1194. Here, as Dr. Borjas's own scholarship demonstrates, even *he* has serious doubts about the reliability of the methods he employed in preparing the expert report submitted in this case. Thus, the court can only conclude that his methods are not reliable. Moreover, given the "political and racial implications of a case of this variety," the likelihood is enhanced that Dr. Borjas's testimony would be confusing to the jury, rather than helpful. *Hall*, 753 F. Supp. 2d at 1147. Therefore, the court concludes that defendants' motion is due to be granted, and Dr. Borjas's expert report stricken.[129]

## III.  MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[130] In other words, summary judgment is proper "after adequate time for discovery and upon

---

[129] Although the "market power" opinion in Dr. Borjas's report was not plagued by the same problems as the other parts of the report, that opinion, standing alone, would not aid the jury. The record contains uncontroverted evidence that Maples Industries sets its wages independent of external factors, such as the wages offered at other local employers.

[130] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration supplied); s*ee*

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## A. Relevant Facts

### 1. Maples Industries and defendants

Maples Industries manufactures rugs for residential use.[131]  At all times relevant to this action, the company operated four plants in Scottsboro, Jackson County, Alabama.[132]  Defendant Wade Maples was the President and Chief Executive Officer of the company, and he owned much of its stock.[133]  Defendant John Maples, the son of Wade Maples, was the Vice President of Maples Industries, and he was a minority shareholder.[134]  John Maples reported to his father, and the two had final authority in company decisions.[135]  John Maples walked the production floors of the plants on a

---

[131] Doc. no. 66-2 (Evidentiary Submission in Support of Summary Judgment), at Ex. A (Wade Maples Decl.) ¶¶ 2-3.

[132] Doc. no. 78-28 (John Maples Dep., May 27, 2010), at 57-58.

[133] Doc. no. 66-2 (Evidentiary Submission in Support of Summary Judgment), at Ex. A (Wade Maples Decl.) ¶ 4; doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 14, 21-24; doc. no. 78-28 (John Maples Dep., May 27, 2010), at 12-13.

[134] Doc. no. 66-2 (Evidentiary Submission in Support of Summary Judgment), at Ex. B. (John Maples Decl.) ¶ 2.  Mark Maples, formerly a defendant in this case, also owned stock in the company.  It is unclear from the record what percentage Wade, John, and Mark Maples each owned, but it seems that Wade owned the largest share (though perhaps not a majority), and Mark the smallest. *See* doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 14, 21-24; doc. no. 78-28 (John Maples Dep., May 27, 2010), at 12-13.

[135] Doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 18-19; doc. no. 78-28 (John Maples Dep., May 27, 2010), at 71.

regular basis, observing the hourly-wage workforce.[136]  Wade Maples also walked

through the production areas, although the testimony of record does not indicate

whether, like his son, he actually made regular inspections.[137]

Defendant Howard Moore was the Human Resources Manager at Maples

Industries.[138]  He was hired in that position in 1997.[139]  His immediate supervisor was

Larry Bailey, the Vice President of Production.[140]  Both John and Wade Maples

approved of the manner in which Moore managed the Human Resources

department.[141]  Defendant Regina "Gina" Mateo was a Personnel Clerk in the Human

Resources department at Maples Industries.[142]  She began working at Maples

---

[136] *See* doc. no. 78-28 (John Maples Dep., May 27, 2010), at 67-68; doc. no. 78-30 (Betty Jo Price Dep., June 8, 2010), at 28 ("Q:  How do you know John?  A:  Because he is in and out through the plant all during the day."); doc. no. 78-31 (Frances Dolores Thomas Dep., June 11, 2010), at 50-51 (testifying that John Maples "goes around checking everything" to ensure that the plant is functioning as it should); doc. no. 78-25 (Elizabeth Bullock Dep., June 9, 2010), at 35, 47 (testifying that John Maples spends time observing production employees in the plant).

[137] Doc. no. 78-25 (Elizabeth Bullock Dep., June 9, 2010), at 35 (testifying that Wade Maples walks around the plant and watches workers); doc. no. 78-35 (Darlene Harbin Dep., Dec. 29, 2009), at 46 (testifying that she saw Wade Maples "just about every day" on her shift); doc. no. 78-36 (Colleen Marie Voight Dep., June 8, 2009), at 24-25 (testifying that she knew who Wade Maples was "from seeing him at the plant, walking through").

[138] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 19.

[139] *Id.*

[140] *Id.* at 20.

[141] Doc. no 78-28 (John Maples Dep., May 27, 2010), at 71-72; doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 13; doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 25-26.  When asked if John and Wade Maples know what his hiring policies are, Moore responded "I doubt it."  Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 13.

[142] Doc. no. 78-9 (Regina Mateo Dep., May 24, 2010), at 74.

Industries in 2004, and conducted interviews and new-employee orientations for all Spanish-speaking hourly-wage employees.[143]   Mateo reported directly to Charlotte McDowell, who in turn reported to Moore.[144]   Prior to her employment by Maples, Mateo had no human resources experience.[145]

## 2.  Plaintiffs and other hourly employees

Plaintiff Audrey Broussard-Wadkins is a United States citizen.[146]   She was an hourly employee at Maples Industries from May of 2005 until February 9, 2009, when she was laid off.[147]   Plaintiff Darlene Harbin is a United States citizen who began working at Maples Industries in 2001.[148]   She also was laid off in February 2009.[149]

About twenty percent of the current hourly-wage workforce at Maples Industries is Hispanic.[150]   That percentage is the result of a sharp increase in the hiring of

---

[143] *Id.* at 59-61.  Thus, she has been employed as a Personnel Clerk for the entirety of the class period, which began on August 4, 2005.  *See* Complaint ¶ 1.

[144] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 54, 59.

[145] Doc. no. 78-9 (Regina Mateo Dep., May 24, 2010), at 60.

[146] *See* doc. no. 78-20 (Audrey Broussard-Wadkins Dep., Dec. 29, 2009), at 13 (testifying that she was born in Biloxi, Mississippi).

[147] *Id.* at 16 (layoff), 24, 30 (hire).

[148] Doc. no. 78-35 (Darlene Harbin Dep., Dec. 29, 2009), at 27, 110.  Harbin's deposition testimony does not address her authorization to work in the United States, but defendants do not challenge it.

[149] *Id.* at 19-20.

[150] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 47-48.  Broussard-Wadkins testified that the workforce was *80%* Hispanic when she began her employment in 2005, and that percentage remained high when she was laid off in 2009.  Doc. no. 78-20 (Audrey Broussard-Wadkins Dep., Dec. 29, 2009), at 75-76.  Plaintiffs cite the 20% figure in their statement of undisputed material facts, and defendants do not dispute that number.  *See* doc. no. 77 (Brief in

Hispanic workers beginning in 2001 or 2002.[151]  Many of those workers have limited

(or no) English proficiency.  To facilitate communication on the plant floors, Maples

Industries requires each Spanish-speaking employee to wear a badge bearing the

numbers "1," "2," or "3."[152]  A "1" indicates the ability to speak "good English," a "2"

signifies an employee who can speak "some English," and a "3" means "no or very

little English."[153]  John Maples and Howard Moore are aware that Maples Industries

relies extensively on Spanish-speaking employees and, therefore, requires translators

on the production floors.[154]

### 3.   Hiring hourly-wage employees

The hiring process for hourly-wage employees begins with the submission of an

employment application.[155]  During the period relevant to this action, applications

were reviewed to determine whether the applicant had previously worked for Maples

---

Opposition to Summary Judgment), at 9.  Therefore, the court will adopt the 20% figure.

[151] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 31.

[152] *See id.* at 147-48; doc. no. 78-20 (Audrey Broussard-Wadkins Dep., Dec. 29, 2009), at 88, 90-91.

[153] Doc. no. 78-20 (Audrey Broussard-Wadkins Dep., Dec. 29, 2009), at 88, 90-91.

[154] *See* Doc. no. 78-32 (Email Exchange Among Howard Moore, John Maples, and Charlotte McDowell) (discussing the desirability of hiring a bilingual Hispanic worker to train other Hispanic workers assigned to the "tufting machine").

[155] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4; doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 116-17.  Moore's deposition testimony did not cover the hiring process in a linear, chronological manner, but plaintiffs did not dispute the description of the process provided in his declaration and repeated in defendants' undisputed material facts.

Industries.[156]   If the applicant was a former employee, defendant Howard Moore determined whether he or she was eligible for rehire.[157]   If the applicant was eligible for rehire, his or her application was placed with the applications of new applicants.[158] The Personnel Clerks then conducted interviews and checked the references provided by each applicant.[159]   If the references proved satisfactory, and the Personnel Clerk conducting the interview considered the applicant suitable for an open position, the applicant was shown that position.[160]  If the applicant expressed a willingness to work in the vacant job position, the Personnel Clerk offered him or her employment, subject to satisfactory completion of a physical examination and a drug screen conducted by a third party.[161]

Beginning in November of 2007, defendant Howard Moore used the Social Security Administration's online verification service to confirm the name, gender, date of birth, and Social Security number of each applicant who satisfactorily

---

[156] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4; doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 204-05.

[157] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4; doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 197.

[158] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4; doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 197.

[159] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4; doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 117-19.  Moore testified that there are no set criteria for who is chosen to be interviewed.

[160] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 4.

[161] *Id.*

completed the physical examination and drug screen.[162]  In September of 2009, *after* the commencement of this action, Moore also began to use the Department of Homeland Security's "E-Verify" service to confirm that each new employee was eligible to work in the United States.[163]  Moore testified that he had not used that service before the commencement of this action, because he mistakenly believed that E-Verify and the Social Security Administration's online verification service were one and the same.[164]  Upon learning that the Social Security service was not the same as E-Verify, Moore began using E-Verify in addition to the Social Security service.[165] If the services did not verify a new employee's eligibility to work, that employee allegedly was required to resolve the problem to the satisfaction of the company's human resources personnel before proceeding to the new employee orientation.[166]

The next stage in the hiring process relevant to plaintiffs' claims was employee orientation.[167]  The orientation sessions lasted approximately two hours, and were conducted by the Personnel Clerks.[168]  Defendant Gina Mateo was responsible for the

---

[162] *Id.* ¶ 5

[163] *Id.* ¶ 8.  E-Verify is used after employee orientation and completion of the Form I-9.  Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 232.

[164] Doc. no. 66-2, at Ex. D (Howard Moore Decl.) ¶ 8.

[165] *Id.*

[166] *Id.* ¶ 5.

[167] *Id.* ¶ 6.

[168] *Id.*  Plaintiffs disputed defendants' assertion that new hires are already employees at the time of orientation, but did not dispute the fact that the Personnel Clerks conduct the orientations.

orientation of Spanish-speaking employees.[169]   The Department of Homeland
Security's Form I-9 was completed during orientation.[170]   The purpose of completing
the Form I-9 was to establish an employee's eligibility to work in the United States.[171]
The employee filled out the top part of the form, providing his or her name, address,
Social Security number, and date of birth, and signed the form, attesting to the truth
of its contents and his or her eligibility to work.[172]   A Personnel Clerk, as an agent of
Maples Industries, filled out the bottom of the form.   His or her task was to examine
the documents tendered by the employee and copy the information from those
documents onto the form.[173]   The Personnel Clerk also was required to sign the form,

---

[169] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 128.

[170] Doc. nos. 78-2 & 78-3 (Howard Moore Dep., May 25, 2010), at 127-28.

[171] *See* doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form
I-9) ECF 8 ("The purpose of this form is to document that each new employee (both citizen and
noncitizen) hired after November 6, 1986, is authorized to work in the United States."); doc. no. 78-2
(Howard Moore Dep., May 25, 2010), at 75.

[172] *See* doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form
I-9) ECF 10 ("**Section 1. Employee Information and Verification**. *(To be completed and signed
by the employee at the time employment begins.)*") (emphasis in original); doc. no. 78-3 (Howard
Moore Dep., May 25, 2010), at 128 (noting that new employees "fill out the documents that they
need to fill out, W-4's . . . I-9's").

[173] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 134, 228-29;  doc. no. 78-6
(Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form I-9) ECF 8 ("Employers
must complete **Section 2** by examining evidence of identity and employment authorization within
three business days of the date employment begins.") & 10 ("**Section 2. Employer Review and
Verification** *(To be completed and signed by employer. . . .)*") (emphases in original).  Employees
must present documents to establish two separate facts:  their identity, and their right to work in the
United States.  Doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank
Form I-9) ECF 11.  Some documents establish both, *e.g.*, a United States passport.  *Id.*  Others only
satisfy one requirement, and must be presented with an additional document to satisfy the other.  A
common example is the combination of a state-issued identification card (identification) and a Social

which contained the following attestation clause:

> I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and relate to the employee named, that the employee began employment on *(month/day/year)* _____ and that to the best of my knowledge the employee is authorized to work in the United States.[174]

Along with his or her signature, the employer's representative was required to include the name and address of the employer and the date on which the form was completed.[175]  Maples Industries did not have a written policy outlining the Form I-9 process.[176]  Neither Wade nor John Maples was aware of the specific procedures used in completing I-9 Forms.[177]

As the Personnel Clerk responsible for conducting the Spanish language orientations, defendant Gina Mateo completed the employer sections of the I-9 Forms

---

Security card (authorization).  An employer cannot require specific documents, *i.e.*, an employer cannot demand that an employee provide a birth certificate instead of Social Security card.  *Id.* at ECF 8 ("Employers cannot specify which document(s) listed on the last page of Form I-9 employees present to establish identity and employment authorization.").

[174] Doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form I-9) ECF 10.

[175] *Id.*

[176] Doc. no. 78-33 (Responses to Interrogatories, John Maples), at Response No. 6 ("Maples has no written policies or procedures with respect to completing I-9 forms and verifying employment eligibility, but follows the procedures and requirements contained in the instructions with the I-9 forms.").

[177] *Id.* at Response Nos. 4-5; doc. no. 78-34 (Responses to Interrogatories, Wade Maples), at Response Nos. 4-5.

for Spanish-speaking employees.[178]   Rather than filling out the signature portion of each Form I-9 *during* the orientation session, Mateo *pre-signed* the forms in batches of fifty, by signing one original and photocopying it 49 times.[179]   She would leave the date field blank, and insert the month, day, and year information during the actual orientations.[180]   Bettye Dudley, a Personnel Clerk responsible for handling English-speaking applicants, also pre-signed her I-9 Forms.[181]   Defendant Howard Moore testified that he learned of that practice only after this action was commenced, and ordered both Mateo and Dudley to stop pre-signing forms.[182]

During the orientation, Mateo looked at the documents each Spanish-speaking employee presented to see whether the photographic identifications matched the person sitting in front of her.[183]   Mateo then made photocopies of the documents.[184] She also checked to see whether the names and dates of birth on the documents

---

[178] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 64.

[179] Doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 101-03.

[180] *Id.* at 101-02.

[181] *Id.* at 103-04.

[182] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 89; doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 103-05.

[183] Doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 126-27 ("Q:  When you got their ID's, would you inspect them?  A:  I would look at the pictures. . . . Q:  Did you look in addition to the pictures at the type [*i.e.*, writing] on the card?  . . . A:  No.") (alteration supplied).  Mateo's testimony regarding the I-9 process was unclear and somewhat contradictory.  The description that follows is based on the information the court was able to rely upon with some certainty.

[184] *Id.* at 120-21, 128 ("Q:  And what's the purpose of looking at their documents?  What is your knowledge of that; why is that required?  A:  Just to make sure that it's the person's picture on there and their information, their name and date of birth.").

matched those in the employment applications, and ensured that each applicant was over the age of eighteen.[185]   Although the employment applications were in the room during orientation, Mateo did not immediately compare the information on the identification documents presented by each Hispanic applicant to that provided on his or her written employment application.[186]   Mateo testified that it was not her responsibility to ask questions about legal status, and she was "not allowed to ask anybody if it's a fake ID or a real ID."[187]   Mateo testified that she did not know the purpose of the I-9 Forms.[188]   She also acknowledged that her practice of pre-signing I-9 Forms was improper.[189]   Even so, she stated that she had no reason to believe that Moore generally disapproved of her work.[190]

### 4.  Fraudulent documents and unauthorized workers

Some of the documents Mateo approved by attestation have defects that seriously undermine their authenticity.   One employee, Ismael Burgos Diaz, presented a

---

[185] *Id.* at 152.  It is unclear whether she looked at this information on the documents, or on the photocopies she made after checking the pictures.

[186] *Id.* at 153-54.

[187] *Id.* at 191-92; doc. no. 78-11 (Regina Mateo Dep., May 24, 2010), at 203.

[188] Doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 106.

[189] *Id.* at 146, 148.

[190] Doc. no. 78-11 (Regina Mateo Dep., May 24, 2010), at 204 ("Q:  Do you have any reason to believe that Howard Moore . . . disagrees with any manner of how you conduct your job?  A: Disagrees?  Q:  Yes, do you have any reason to think he is unhappy with the way you do your job? A:  I don't know.  Q:  Has he told you that he . . . disagreed with or disapproved of something you were doing?  A:  No.")

document purporting to be a Tennessee non-driver's identification card that listed his home address as "80 Mimosa Road, *Chatanoga*, Tennessee."[191]  In her deposition, Mateo acknowledged that Chattanooga appeared to be spelled incorrectly.[192]  She stated that she likely had not noticed the error at the time, because she did not look at addresses on identification documents.[193]  Defendant Howard Moore testified that such a misspelling would not have raised a red flag in his mind because there may be a "Chatanoga" in Tennessee, or "Chattanooga" may have been abbreviated to fit on the card.[194]  Another employee filled out his portion of the Form I-9 under the name Juan *Irgo*, but presented a North Carolina non-driver's identification card and Social Security card bearing the name Juan *Antonio Garza, Jr.*[195]  Moore's explanation for that discrepancy was:  "often Hispanics use names, put them in different order than I'm used to or anyone else is used to."[196]

Over the course of the class period, Maples Industries hired approximately 3,700

---

[191] *See* doc. no. 78-40 (Form I-9 and Documents, Ismael Burgos Diaz) (emphasis supplied); doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 168-72.

[192] Doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 175.

[193] *Id.* at 176.

[194] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 69.

[195] Doc. no. 78-7 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 67 (Form I-9 and Documents, Juan Irgo) ECF 8-9; *see also* doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 163-69, 175-76.

[196] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010) at 176.

hourly-wage workers.[197]  Plaintiffs' immigration expert, Edward Mallon, examined the personnel files for 840 of those:  a sample representing 22.7% of the total.[198] Based on the information in those files, he determined that 139, or 16.547%, of the sample of 840 workers were illegal aliens.[199]  Among the personnel files he examined, Mallon found that the company hired at least ten illegal immigrants in each year of the class period.[200]

In support of their motion for summary judgment, each of the individual defendants submitted a declaration.  The third paragraph of each declaration included an identical statement:  "I have no knowledge concerning how any foreign-born present or former employee of Maples Industries entered the United States."[201]

## 5.  Wages

Hourly-wage employees of Maples Industries were paid according to a wage scale that had been in place for decades.[202]  The wage scale set the hourly wage for each

---

[197] Doc. no. 78-13 (Expert Report of Edward Mallon), at 3.

[198] *Id.*  For a full description of Mallon's methodology, see Part II(B)(3) of this opinion, *supra*.

[199] *See* doc. no. 78-17 (Expert Report of Dr. George J. Borjas) ¶ 59 (analyzing Mallon's results).

[200] Doc. no. 78-18 (Lance V. Oliver Decl.) ¶¶ 3-4.

[201] *See, e.g.*, doc. no. 66-2 (Evidentiary Submission in Support of Summary Judgment), at Ex. D (Howard Moore Decl.) ¶ 3.

[202] Doc. no. 78-28 (John Maples Dep., May 27, 2010), at 95.

category of employee.[203]  New employees were paid a certain wage, which increased at regular intervals in the early period of employment; depending on the job category, a worker might receive wage increases after 30, 60, 90, 120, or 180 days of satisfactory employment.[204]  After 180 days, a worker's wage became static, unless the company decided to increase wages for all job classifications, or the employee moved into a position paid according to a different wage scale.[205]  The company also paid an increased wage to employees working on the second and third shifts.[206]

Although the basic wage scale had been in place for over forty years, the actual wages were increased on numerous occasions.  At the end of each year, John Maples and Larry Bailey determined whether to increase wages for the following year.[207]  The factors they considered in deciding whether to raise wages included inflation and cost of living statistics, but the primary focus was on the profitability of the company.[208]  During the class period, Maples and Bailey had never taken the wage scales of other

---

[203] *Id.* at 94-95.

[204] *See* doc. no. 78-29 (John Maples Dep., May 27, 2010), at 112-13.  Not every job category has a wage increase at each 30 day interval.  *See* doc. no. 78-37 (Job Pay Scales).

[205] Doc. no. 78-29 (John Maples Dep., May 27, 2010), at 119-20; s*ee also* doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 47-48.

[206] Doc. no. 78-29 (John Maples Dep., May 27, 2010), at 121.

[207] *See* doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 43.  *See also* doc. no. 78-28 (John Maples Dep., May 27, 2010), at 98.

[208] Doc. no. 78-28 (John Maples Dep., May 27, 2010), at 97; doc. no. 78-29 (John Maples Dep., May 27, 2010), at 105-06.

employers in the Jackson County area into consideration.[209]  If a raise was instituted, it was done by uniformly increasing the hourly rates of workers across all categories.[210]  In addition to determining whether to raise wages, John Maples and Bailey also decided whether to pay a bonus.[211]  The factors considered in offering a bonus were the same as for wage increases, and "typically, the [wage] increase would coincide with the bonus."[212]  John Maples and Bailey met with Wade Maples and gave him their recommendation to raise or not to raise wages.[213]  During the class period, Wade Maples always adopted their recommendations.[214]  During that time, Maples Industries increased wages only twice: the first time in September 2006 and the second in December 2009, the latter coming five months after this suit was filed.[215]

---

[209] Doc. no. 78-29 (John Maples Dep., May 27, 2010), at 106-07.

[210] Doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 38-40 ("[I]f your pay is a certain amount, and we are giving a three percent increase or five percent increase, we add that to your pay, and that is your pay for the next year."); doc. no. 78-29 (John Maples Dep., May 27, 2010), at 104-05 ("[W]e would come up with a sort of a flat number of cents per hour that we would add to all hourly employees' pay.").  Occasionally, the company will raise the wage of an individual category or job type in order to attract workers to fill a particular need, but only as a "last resort."  *Id.* at 102-03.

[211] Doc. no. 78-29 (John Maples Dep., May 27, 2010), at 135-36.

[212] *Id.* at 135-37 (alteration supplied).

[213] *See* doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 43.

[214] *Id.* at 45.

[215] Doc. no. 78-37 (Job Pay Scales); *see also* doc. no. 78-29 (John Maples Dep., May 27, 2010), at 124, 126-27.

### 6.   Immigration enforcement at Maples Industries

Maples Industries employed a significant number of Hispanic workers over the course of the class period, and some of those employees were occasionally arrested and terminated for identity theft.[216]  Defendant Howard Moore testified that he had received numerous telephone calls from people who stated that Hispanic employees of Maples Industries were working under their names and social security numbers.[217]  When he received such telephone calls, Moore referred the callers to the local police, because he "felt like it was the police's job" to investigate an alleged crime.[218]  Before making an arrest, the police called Moore and asked him for information about the employee, such as the address and telephone number he or she had provided Maples Industries, and the shift he or she worked on.[219]  The police also obtained subpoenas for the I-9 Forms of the employees accused of identity theft.[220]  Despite arrests of a number of Hispanic employees of Maples Industries for identity fraud, federal

---

[216] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 152 ("I found out that sometime[s] the Social Security didn't match and I found out that people have been — we have had the police in and arrested people for stealing someone's identity.  . . .  It's probably happened five or six times.") (alteration supplied); *id.* at 159-60 ("Q:  How many people have terminated for identity theft, roughly?  A:  Seven, eight.").

[217] *Id.* at 153.

[218] *Id.* at 153-55.

[219] *Id.* at 156-58.

[220] *Id.* at 158.

immigration agents have never conducted a "raid."[221]  Even so, rumors occasionally

spread among the hourly-wage workforce that immigration raids were imminent.

When that occurred, there were significant absences among the workforce, causing

some production lines to shut down.[222]

In addition to the arrest of some Maples Industries employees for identity theft,

defendant Howard Moore also received notice of employees with non-matching

names and Social Security numbers.  Moore received an anonymous letter listing

workers alleged to have false Social Security numbers.[223]  He ran the Social Security

numbers of the people listed through the Social Security Administration verification

program, and learned that many of them had non-matching numbers.[224]  Moore also

received a letter from the Social Security Administration, indicating that forty-two

Maples Industries employees had non-matching Social Security numbers.[225]  When

that occurred, Moore told the people on the list that they had "sixty days . . . to get

---

[221] Doc. no. 78-27 (Wade Maples Dep., May 28, 2010), at 36-37.

[222] Doc. no. 78-25 (Elizabeth Bullock Dep., June 9, 2010), at 17 ("Well, it was going around the plant as rumors that they were going to come in and raid the place.  And the day it was supposed to happen or whatever, half of them [workers who could not speak English well] didn't show up. And we had a lot of work.  We couldn't get our hot orders out.  We couldn't stay caught up.  So it was — You know, we couldn't get stuff we were supposed to get out that day.") (alteration supplied); *id.* at 43-45 (same); doc. no. 78-26 (Robert Wayne Bullock Dep., June 7, 2010), at 33-34 ("Q:  What happened on the days of the supposed raids at Maples?  A:  Some went home.  Some didn't come in.  Some of the Spanish [speakers] laid out.") (alteration supplied).

[223] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 236-38.

[224] *Id.* at 240.

[225] *Id.* at 241.

their problem straightened out."[226]   All but five of the employees listed in the letter

from the Social Security Administration "either resigned or were terminated  . . .

because they never [came] in and corrected their Social Security Number."[227]   One of

those employees, Mary Mendoza, returned to Maples with a new number and a new

name, Mary Guzman.[228]   Moore admitted that he could not explain how she could

have done so.[229]

## B.  Discussion

### 1.  The INA "hiring provision"

The first RICO predicate statute relied upon by plaintiffs is the so-called "hiring

provision," which makes it illegal, "during any 12-month period, [to] knowingly

hire[] for employment at least 10 individuals with actual knowledge that the

individuals are aliens as described in [§ 1324(a)(3)(B)]."  8 U.S.C. § 1324(a)(3)(A)

(alterations supplied).  Section 1324(a)(3)(B) defines the term "alien" as meaning (1)

"an unauthorized alien" who was not lawfully admitted for permanent residence or

authorized to be employed, who (2) who was "brought into the United States in

violation of [§ 1324(a)]."  8 U.S.C.  § 1324(a)(3)(B) (alteration supplied).   The

---

[226] *Id.*

[227] *Id.* at 244-45 (alteration supplied).

[228] *Id.* at 248.

[229] Doc. no. 78-3 (Howard Moore Dep., May 25, 2010), at 250.

Eleventh Circuit has helpfully parsed this statutory language into its constituent elements, and clarified the relationship of the parts to one another.  *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292-93 (11th Cir. 2010).  For an employer to violate the statue, he must not only (*i*) hire ten individuals (*ii*) during any twelve-month period (*iii*) with actual knowledge that they are unauthorized for employment in this country, but the employer must also (*iv*) have actual "knowledge that the alien was brought into the country illegally." *Id.* at 1293.  The final element is critical, as the Eleventh Circuit noted in *Edwards*, because it demarcates the distinction between a crime under the INA that would be a RICO predicate act and one that would not be such an act. *Id.*  "'If the employer does not know that at least 10 of its illegal hires were 'brought into' the country by some third party (as opposed to walking across the border themselves, or arriving on a visitor's or student visa and outstaying their welcome), then it has not committed a RICO predicate act by hiring them . . . .'" *Id.* (quoting *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 534 (S.D.N.Y. 2009)).

The INA also outlaws the knowing hiring of an illegal immigrant, 8 U.S.C. § 1324a, but that crime is not a RICO predicate act.  *See* 18 U.S.C. § 1961(1)(F) (limiting RICO liability for INA violations to violations of 8 U.S.C. §§ 1324, 1327-28).  The emphasis placed upon the actual knowledge element of § 1324(a) is a central part of the congressional design of both the INA itself, and, its selective

incorporation in § 1961(F) of RICO.  *Edwards*, 602 F.3d at 1293.  The requirement of showing *actual knowledge* that an alien was brought into the country illegally is paramount.  As explained by the Northern District of Illinois,

> "actual knowledge" must be understood to mean something more than "constructive knowledge."  This is apparent, first, from the language of § 1324(a)(3); the phrase "knowingly hire for employment at least 10 individuals with actual knowledge that [they are unauthorized]" suggests that "actual knowledge" is something more than general "knowing." . . . Additionally, the implementing regulation for 8 U.S.C. § 1324a — a closely related provision that focuses exclusively on the employment of aliens — defines "knowing" as "having actual or constructive knowledge."  8 C.F.R. § 274a.1.  This disjunctive makes no sense if constructive knowledge means the same thing as actual knowledge.

*A.L.L. Construction Co., Inc. v. Omielan*, No. 07-C-5761, 2009 WL 2214026, at *7 (N.D. Ill. July 23, 2009) (alteration in original).

Assuming for the sake of discussion that plaintiffs have adduced sufficient evidence to create a genuine issue of material fact about the question of whether defendants hired aliens with some form of knowledge that they were *in the United States* illegally, plaintiffs fail to squarely argue that defendants had *actual knowledge* those aliens were illegally *brought into* the United States, as opposed to walking cross the border, or arriving on a visitor's visa and overstaying their welcome.  In his report, Mallon wrote that he was "of the expert opinion that human resources employees of Maples falsely certified I-9 Forms, and knowingly hired aliens who

were unauthorized to work in the United States."[230]   In other words, his opinion concerned the knowledge of defendants' employees, and postulates that they were aware that they were hiring illegal workers, but made no mention of whether the defendants' employees knew the workers had been smuggled into the United States. In response, defendants point to their declarations.  For example, Howard Moore stated that he had "no knowledge concerning how any foreign-born present or former employee of Maples Industries entered the United States."[231]

Of course, this court is required to view all evidence in the light most favorable to plaintiffs. *See Chapman*, 229 F.3d at 1023.  Thus, if plaintiffs provide evidence conflicting with defendants' declarations, the court must give credence to that evidence, rather than defendants' declarations.  Here, however, plaintiffs provide no admissible evidence whatsoever that even remotely suggests that defendant Gina Mateo or her co-defendants had actual knowledge that *any* Hispanic person hired by Maples Industries had been "smuggled ('brought') into the United States," much less the ten in a calendar year that the statute requires.  *Nichols*, 608 F. Supp. 2d at 534. "An employer may know that it hired illegal aliens without knowing how they made their way into the United States"; and, in that circumstance, the employer would not

---

[230] Doc. no. 78-13 (Expert Report of Edward Mallon), at 6.

[231] *See*, *e.g.*, doc. no. 66-2 (Evidentiary Submission in Support of Summary Judgment), at Ex. D (Howard Moore Decl.) ¶ 3.

72

violate the hiring provision.  *Edwards*, 602 F.3d at 1294.

Plaintiffs argue on the basis of the four grounds discussed in the following subsections that Gina  Mateo had actual knowledge that she was hiring aliens who had been "brought into" the country illegally.  The primary flaw in each of the arguments is that they are conclusory assertions, unsupported by any evidence in the record.

### a.  Plaintiffs' attack on Mateo's credibility

Plaintiffs first assert that "Mateo's testimony is not credible."[232]  Mateo's deposition testimony indicated that, even though she is a natural-born United States citizen, her parents and husband may have entered the country illegally.[233]  When asked whether she knows or thinks that there is an illegal immigration "problem" in the United States or in Alabama, Mateo responded "I don't know."[234]  She also testified that the Form I-9 "[c]omes from" the "U.S. Department of Justice, Immigration," but she does not know the purposes for which the form is used.[235] "Simply put," plaintiffs argue, "portions of Mateo's testimony border on the absurd," allowing a jury to draw a reasonable inference that she "is lying to protect her job and

---

[232] Doc. no. 77, at 15.

[233] Doc. no. 78-9 (Regina Mateo Dep., May 24, 2010), at 21, 24, 29.

[234] Doc. no. 78-11 (Regina Mateo Dep., May 24, 2010), at 222-23.

[235] Doc. no. 78-9 (Regina Mateo Dep., May 24, 2010), at 32 (alternation supplied).

avoid liability."[236]

"Simply put," plaintiffs' argument is not persuasive.  The immigration status of Mateo's parents and husband is not only entirely irrelevant to this litigation, but plaintiffs' attempt to use it to discredit Mateo's testimony borders on xenophobic paranoia.  The suggestion that her testimony is not credible because she claimed to be unaware of an "immigration problem"  appears to be rooted in the "common sense" and "common knowledge" bases on which plaintiffs rely in their other lines of argument discussed below.  It clearly is not based on any admissible evidence to the contrary.  Most importantly, however,  credibility assessments are not proper at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment.").  Moreover, plaintiffs' credibility attack is based in part on defendant Gina Mateo's responses to questions that are, at best, only marginally relevant to their claims.[237]

Plaintiffs rely on a recent Sixth Circuit decision to support their argument that

---

[236] Doc. no. 77, at 16.

[237] Here, at most, plaintiffs have shown that Mateo testified inconsistently regarding the immigration status of her parents and husband.  Such an inconsistency does not create a genuine issue of *material* fact.

Mateo's testimony is not credible.  *See United States v. Ramirez*, 635 F.3d 249 (6th Cir. 2011).  In that case, the Sixth Circuit affirmed Shanna Ramirez's conviction for conspiracy, fraud, and perjury.  *Id.* at 251-52.  Ramirez, who had been employed in a role similar to the position held by Mateo, admitted to an immigration official that her employer was knowingly hiring illegal immigrants, that many employees had submitted false documents, and that she had helped her boyfriend obtain a job by submitting false documents to her employer.  *Id.* at 252.  She was called to testify before a grand jury, but in that testimony she stated that she was unaware that her boyfriend had submitted false documents, and that she had no reason to believe any employees were illegal aliens.  *Id.* at 253.  At Ramirez's trial, the government introduced her statements to the immigration officer and her conflicting grand jury testimony, as well as employment documents relating to several employees, including I-9 Forms.  *Id.*  The government and Ramirez stipulated that the employees were illegal aliens.  *Id.*  Ramirez was convicted, and she appealed on the ground that her conviction was improper because her confession to the immigration officer was not corroborated by other evidence.  *Id.* at 256.[238]  Ramirez argued that "[t]here was no additional evidence demonstrating that the documents themselves were fraudulent, or that Ramirez knew the documents to be fraudulent.  . . .  [and] there was no

---

[238] A defendant cannot be convicted based solely on his uncorroborated statements or confessions.  *Smith v. United States*, 348 U.S. 147, 153–54 (1954).

testimony or evidence that [her boyfriend ] entered the United States illegally, [or] how he came to the United States . . . ." *Id.* at 260-61 (alterations supplied). The Sixth Circuit affirmed the conviction, and held that there was sufficient circumstantial evidence to corroborate her statements. The circumstantial evidence included the fact that Ramirez's boyfriend had used inconsistent names in filling out employment paperwork, and the fact that her husband (a different man) had previously been deported for being an illegal immigrant. *Id.* at 261. "[S]pecifically, a rational juror could have concluded that Ramirez knew that . . . her live-in boyfriend . . . was an illegal alien and that he submitted false documents, which Ramirez helped prepare, . . . to secure a job." *Id* (alteration supplied).

Plaintiffs argue that *Ramirez* supports their position that Mateo's testimony is not credible and, therefore, that there is a genuine issue of material fact regarding her actual knowledge that she hired people who had been *brought into* the country illegally.[239] That argument is not well founded. At most, *Ramirez* suggests that circumstantial evidence, including a close personal relationship, could be used to prove that Mateo had knowledge of the immigration status of a specific individual, such as a parent, or spouse, or boyfriend. That does nothing, however, to demonstrate that she had actual knowledge of how at least ten employees of Maples Industries

---

[239] Doc. no. 100 (Plaintiffs' Supplemental Authority in Opposition to Summary Judgment), at 2.

*entered* the United States during each of the calendar years at issue in this case.

Plaintiffs cite *Ramirez* to demonstrate the validity and importance of considering circumstantial evidence in determining state of mind, but they have provided no such circumstantial evidence.  Plaintiffs argue that, under *Ramirez*, "a rational jury might simply find Defendant Mateo's affidavit and testimony not credible."[240]  That is a truism that does not require supporting authority. A rational jury can *always* determine that a particular witness is not credible.  But, that does not advance the plaintiffs' proof.  Even if this court were to believe that Mateo's deposition testimony is not credible, that lack of credibility is no substitute for plaintiffs' production of substantive evidence (as opposed to *impeachment* evidence) showing that defendants had *actual knowledge* that the Spanish-speaking persons hired by Maples Industries had been illegally *brought into* the United States, as opposed to walking across the border unaided by other individuals, or remaining in the country beyond the expiration of a visa.

### b.   Plaintiffs' "common sense" arguments

Plaintiffs made three additional arguments in support of their § 1324(a) claim that are not based upon the evidence of record, but upon "common sense" and "common

---

[240] *Id.*

knowledge."[241]    First among those arguments is plaintiffs' contention that it is "common knowledge" that unauthorized aliens must obtain some assistance when coming into the United States, because "it is almost impossible for illegal aliens to successfully sneak across the border without help."[242]    If that was sufficient to satisfy plaintiffs' burden of evidentiary *proof*, the "brought into" requirement would functionally be written out of the statute.    Moreover, the Eleventh Circuit has noted several means by which aliens may enter the United States without the assistance that the "brought into" element contemplates, including overstaying a student visa, walking across the border, or visiting as a tourist and remaining to work.    *Edwards*

---

[241] Plaintiffs stated that "[c]ourts frequently invoke common sense propositions, and have done so on immigration issues."  Doc. no. 77 (Brief in Opposition to Summary Judgment), at 16 n.3 (alteration supplied).  They cite only *NLRB v. Sure-Tan, Inc.*, 672 F.2d 592, 601 n.14 (7th Cir. 1982).  *Sure-Tan* involved an employer's retaliation against employees for union activity; the company reported the illegal status of some of its employees to INS.  *Id.* at 601.  However, the employer was *not* facing immigration charges in the case.  Instead, the issue was whether illegal immigrants were protected under employment laws and entitled to relief, such as backpay, as restitution for the employer's retaliation.

In the footnote plaintiffs cite, the Seventh Circuit stated that the company could not wash its hands of the immigration violations of its employees, as it would be implausible that the employer would not at least suspect some of the workers were illegal.  In other words, an employer cannot hire illegal immigrants, mistreat them, and then hide behind the fact that they cannot legally work here in the first place when sued for mistreating them.  In no way does the *Sure-Tan* footnote suggest that such "common sense" suspicions could amount to evidence sufficient to satisfy a statutory "actual knowledge" element.

Plaintiffs' citation to *Ramirez* for the proposition that "common sense" obviates the need to prove "actual knowledge" is likewise ill-founded.  Moreover, both *Sure-Tan* and *Ramirez* applied "common sense" to impute knowledge of immigration status, not to impute knowledge that somebody had been *brought into* the United States.

[242] Doc. no. 77 (Brief in Opposition to Summary Judgment), at 16 (citing Expert Report of Edward Mallon, at 2-3).

*v. Prime*, 602 F.3d 1276, 1294 (11th Cir. 2010).

Plaintiffs next argue that "the sheer number of illegal aliens" hired by defendant Gina Mateo supports a reasonable inference that she had actual knowledge as to how they entered the United States, because "[i]t is simply not plausible that" she believed so many could cross the border without assistance.[243]   Plaintiffs did not cite any authority for that argument; and, as with their "common knowledge" argument, adopting it would essentially write the "brought into" requirement out of the hiring provision.  Additionally, the hiring provision only creates liability for employers who hire at least ten employees during a calendar year with actual knowledge that they were brought into the country:  *i.e.*, it is a statute designed to target employers who hire a large number of illegal aliens.  Any employer accused of violating the statute would necessarily have hired many illegal immigrants; even so, that fact cannot be used to eliminate the actual knowledge requirement.

Finally, plaintiffs point to the fact that Alabama does not border Mexico.  Relying here on "common sense," plaintiffs argue that any illegal aliens hired at Maples Industries "received some transportation assistance during their journey as they did not ***walk*** to Alabama alone."[244]   It bears noting that *none* of the three states that

---

[243] *Id.* at 16-17 (alteration supplied).

[244] *Id.* at 17 (emphasis in original).

comprise the Eleventh Circuit share a border with Mexico, yet the Eleventh Circuit explicitly held in *Edwards* that the statute requires evidence of actual knowledge that an alien was *brought into* the country illegally. *Edwards*, 602 F.3d at 1293. This court is not at liberty to ignore that binding precedent, even if "common sense" should dictate that illegal immigrants cannot walk to Alabama alone.[245]

Plaintiffs also opine that the acquisition of false papers requires assistance: an argument also made in a similar case brought by the same attorneys representing the present plaintiffs. In that case, the plaintiffs relied on several cases from other circuits that applied a broad construction to statutory language similar to the "brought into" provision of § 1324(a). This court held that those cases "certainly do not hold that assistance in obtaining stolen security numbers and other fake identification documents in order to obtain employment at the plant, once an individual has established residence in the United States, would constitute bringing in." *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1156 (N.D. Ala. 2010) (internal quotation marks omitted, alteration supplied).

Plaintiffs also argue that a jury could find that Mateo and the other defendants were deliberately ignorant of the fact that they were hiring illegal aliens in violation

---

[245] "Common sense" would also dictate that an illegal immigrant could purchase a bus ticket from a border state to Alabama. The transportation "assistance" rendered by the ticket agent (who has no obligation or authority to check immigration papers) would certainly not constitute an act satisfying the statutory requirement.

of § 1324(a)(3)(A).[246]   Plaintiffs point to background information provided by applicants that "is inconsistent, if not implausible, on its face."[247]   Yet, once again, plaintiffs fail to offer any evidence that establishes the key elements of the violation: *actual knowledge* that the employees were illegally *brought into* the United States. The same deficiency exists in plaintiffs' arguments based on Maples Industries' receipt of notice that some of its employees had invalid Social Security numbers, and the arrests of some employees for being unauthorized.   Government notification to an employer that some of its employees possess invalid Social Security numbers puts that employer on notice that it may be employing illegal workers, and such notice can serve as *constructive* notice sufficient for a violation of § *1324a* for continuing to employ that person. *See Mester Manufacturing Co. v. INS*, 879 F.2d 561, 566-67 (9th Cir. 1989).   However, *constructive notice* that current employees are illegal immigrants does not translate into *actual knowledge* that, at the time of hiring, new employees had been *brought into* the country illegally, in violation of § *1324(a)*.

Plaintiffs' reliance on "common sense" to prove "actual knowledge" seems to be an outgrowth of the difficulty in proving actual knowledge.   Indeed, it is axiomatic that mental states such as "knowledge" must almost always be proven by

---

[246] Doc. no. 77 (Brief in Opposition to Summary Judgment), at 17-19.
[247] *Id.* at 18.

circumstantial evidence.  *See*, *e.g.*, *United States v. Santos*, 553 U.S. 507, 521 (2009) ("As for the knowledge element of the money-laundering offense . . . that will be provable (as knowledge must almost always be proved) by circumstantial evidence."). Even so, as the Northern District of Illinois explained, *actual knowledge* in the context of Immigration and Nationality Act statutes is not equivalent to constructive knowledge.  *A.L.L. Masonry Construction Co.*, 2009 WL 2214026, at *7.  For an example of circumstantial evidence that might satisfy the "actual knowledge" requirement of INA statutes, one could look for evidence that an employer had a business relationship with an immigrant smuggler.  In fact, in the "Illegal Immigration Overview" section of his expert report, Mallon explained that such smugglers, so-called "coyotes," often use "runners" who have contacts with employers to find employment for illegal immigrants.[248]   Thus, proving actual knowledge by circumstantial evidence can be done without a resort to "common sense" propositions.  Here, plaintiffs have failed to provide even circumstantial evidence.

## 2.   The "attestation provision"

Inasmuch as the previous lines of argument are unavailing, the ability of plaintiffs' cause of action to survive summary judgment turns on the other alleged pattern of racketeering activity:  Defendant Gina Mateo's false attestations on I-9

---

[248] Doc. no. 78-13 (Expert Report of Edward Mallon), at 2.

Forms in violation of 18 U.S.C. § 1546(b) (the "attestation provision").  That statute imposes criminal liability on "[w]hoever uses . . . a false attestation, for the purpose of satisfying a requirement of [8 U.S.C. § 1324a(b)]."  18 U.S.C. § 1546(b)(3) (alterations supplied).  Section 1324a(b) (the "verification provision"), in turn, states that a "person or other entity hiring, recruiting, or referring an individual for employment in the United States . . . must attest, under penalty of perjury and on a form designated or established by the Attorney General by regulation [*i.e.*, the Form I-9], that it has verified that the individual is not an unauthorized alien by examining" identification documents.  8 U.S.C. § 1324a(b)(1)(A) (alteration supplied).  The provision goes on to state that the "person or entity has complied with the requirement of this paragraph with respect to examination of a document if the document reasonably appears on its face to be genuine."  *Id.*  If the prospective employee produces documents satisfying that criterion, "nothing in this paragraph shall be construed as requiring the person or entity to solicit the production of any other document or as requiring the individual [seeking employment] to produce such another document."  *Id.* (alteration supplied).

Plaintiffs allege two bases for Mateo's violation of the attestation provision. They argue that, by pre-signing I-9 Forms in batches of fifty, Mateo falsely attested, because she made the attestations *before* examining the documents.  Additionally,

they argue that the procedure by which Mateo examined the documents was inadequate under the verification provision.   Defendants contest both of these theories, arguing that Mateo did not actually effect attestations until she dated the pre-signed forms, which occurred after she had examined the documents, and that she had satisfactorily complied with the verification provision.

Additionally, defendants argue that Mateo, as an employee of Maples Industries, cannot be held liable under § 1324a(b), because she is not an "employer." Defendants argue that only employers can be liable under § 1546 and § 1324a.   They argue that the "person or other entity" language in § 1324a is in place to cover types of employers, not agents of employers.   Defendants argue that interpreting the statutory language to include agents "would render meaningless the phrase 'or other entity,' since such other entities can act only through persons they employ."[249] However, the statute's implementing regulations undermine defendants' interpretation.   The regulations state that the employer is responsible for the Form I-9, and define employer as "a person or entity, *including an agent or anyone acting . . . in the interest thereof . . . .*"  8 C.F.R. § 274a.1(g) (emphasis supplied); *see also id.* § 274a.2(a)(3).   As an agent of Maples Industries, Mateo is included under the definition of "employer" for the purposes of § 1324a, and if the evidence shows that

---

[249] Doc. no. 66-1 (Brief in Support of Summary Judgment), at 13.

Mateo failed to comply with § 1324a ("the verification provision"), it will necessarily demonstrate that she violated § 1546 ("the attestation provision"), as the latter provision requires her to attest to her compliance with the former.

### a.   Compliance with the verification provision

Plaintiffs have proffered evidence that some of the documents which Mateo accepted as proof of identification or work authorization were forgeries.[250]  Even so, compliance with the verification provision does not turn exclusively on the actual validity of the documents examined; instead, the statute is deemed to be satisfied if "the document[s] reasonably appear[] on [their] face to be genuine."  8 U.S.C. § 1324a(b)(1)(A) (alterations supplied).

### i.   Statutory interpretation

In construing a statute, the court must begin with its plain text.  *E.g.*, *Wyeth v. Levine*, 555 U.S. 555, 599 n.6 (2009) (Thomas, J., concurring) (reiterating the usual "impropriety of looking beyond the plain text").[251]

---

[250] *See generally* doc. nos. 78-13 through 78-16 (Expert Report of Edward Mallon).

[251] *See also, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete.") (internal citations and quotation marks omitted); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1185 (11th Cir. 1997) ("In construing a statute we must begin, and often should end as well, with the language of the statute itself.").  "In [this] circuit, '[w]hen the import of the words Congress has used is clear . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language.'" *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1167 (11th Cir. 2003) (quoting *United States v. Weaver*, 275 F.3d 1320, 1331 (11th Cir. 2001)) (first alteration supplied, second alteration

Here, the statute to be construed provides that "[a] person or entity has complied with the requirement of this paragraph with respect to examination of a document if the document *reasonably appears on its face to be genuine*."  8 U.S.C. § 1324a(b)(1)(A) (emphasis supplied).  A plain language reading of those words leads to the conclusion that the statute requires only an inspection of the document itself for indicia of authenticity.  The inclusion of "reasonably" indicates that it is an objective standard; some examination is required.  However, the "on its face" language indicates that the inquiry need not extend beyond the four corners of the document.  Thus, an identification document with a photograph that does not match the person presenting it, or one with obvious misspellings, would not "reasonably appear on its face" to be genuine.  Conversely, a document that is internally consistent, but inconsistent with other information presented by a prospective employee (such as an employment application containing conflicting information), would still appear to be genuine *on its face*.

The Eleventh Circuit has not had the occasion to construe the relevant statutory language, but the Ninth Circuit has done so.  In *Collins Foods International, Inc. v. United States Immigration and Naturalization Service*, 948 F.2d 549 (9th Cir. 1991), Collins Foods was accused of violating the verification provision through the actions

in *Shotz*).

of its employee, Ricardo Soto.  *See id.* at 553.  Soto had hired an illegal alien named Armando Rodriguez.  *Id.* at 550-51.  Rodriguez had produced a genuine driver's license and a forged Social Security card.  *Id.*  Soto copied the information from the documents onto the Form I-9.  *Id.* at 550.  He did not inspect the reverse side of the Social Security card, or compare it to the sample in the INS handbook, nor balk at the fact that the card spelled "Rodriguez" as "Rodriquez."  *Id.* at 551, 553.  An administrative law judge (ALJ) ruled that Soto failed to comply with the verification provision, but the Ninth Circuit reversed.

The Ninth Circuit noted that, even with the misspelling, the ALJ acknowledged that "at a glance the card on its face did not appear to be false." *Id.* at 553.  The court rejected the ALJ's determination that Soto's failure to compare the Social Security card to the example in the INS handbook violated the verification provision.  The Court first observed that "nothing in the statute . . . requires such a comparison." *Id.* Moreover, a comparison with the handbook example would not be entirely determinative, because "[t]he handbook contain[ed] but one example of a Social Security card, when numerous versions exist." *Id.* at 553 & n.14 ("In fact, there are 16 valid versions of the Social Security card currently in circulation.") (alterations supplied).  Stating that "[t]he card Rodriguez presented was not so different from the example that it necessarily would have alerted a reasonable person to its falsity," the

87

Ninth Circuit held that Collins Foods had complied with the verification provision. *Id.* at 553 (alteration supplied).

The *Collins Foods* court also discussed the legislative history of the verification provision.  The court quoted from the report of the House Judiciary Committee to demonstrate "that Congress did not intend the statute to cause employers to become experts in identifying and examining a prospective employee's employment authorization documents."  *Id.* at 554.  That report states that there is no expectation "that employers ascertain the legitimacy of documents presented during the verification process."  H.R. Rep. No. 99-682, pt. 1, at 61.  Additionally, the report stated that the "reasonable man" standard should be applied to document verification, and "emphasize[d] that documents that reasonably appear to be genuine should be accepted by employers without requiring further investigation, [*sic*] of those documents."  *Id.* at 62 (alteration supplied).  The Ninth Circuit concluded by stating that "Congress carefully crafted section 1324a to limit the burden and the risk placed on employers.  The ALJ's holding in this case places on employers a verification obligation greater than that intended by Congress and beyond that outlined in the narrowly-drawn statute."  *Collins Foods*, 948 F.2d at 554.

### ii. Application of the statute to the facts in the record

Plaintiffs presented three types of evidence in support of their argument that defendant Gina Mateo, as "an agent . . . acting . . . in the interest of" Maples Industries,[252] violated the verification provision. First, they offered evidence that Maples Industries hired numerous illegal immigrants. Plaintiffs' immigration expert, Edward Mallon, compared the information provided on employment applications with that contained in documents presented by the same people.[253] He found numerous examples of employment applications that contained background information that was inconsistent with the other documentation presented by the employees during the Form I-9 process.[254] Mallon relied on those inconsistencies in reaching his opinion that a significant percentage of Maples employees presented false documents during the class period and, thus, likely were not authorized to work legally in the United States.[255] That analysis does not show a violation of the verification provision, however, because, as previously discussed, that statute focuses only upon whether the documents presented by the employee *reasonably appear* genuine *on their face*.

Mallon also relied on geographical discrepancies in his analysis: *e.g.*, an

---

[252] *See* 8 C.F.R. § 274a.1(g).

[253] *See* doc. no. 78-13 (Expert Report of Edward Mallon), at 4-5.

[254] *See id.*

[255] *Id.* at 4-6.

89

employee claiming to be born in one state, but presenting a social security number originating in a different state; or an identification card issued in one state on a date the employee claimed to have resided in another.[256]   Such circumstances are undoubtably suspicious, but they are not relevant to the procedure required by the verification provision.   If a document "reasonably appears on its face to be genuine,"[257] the inquiry ends.   Information provided on another form has no bearing on whether a document appears genuine *on its face*.[258]   To read a requirement of cross-checking documents against information contained on forms entirely independent of the documents would be directly contrary to the statutory language. In order to establish violations of the verification provision, plaintiffs must demonstrate that Mateo attested to the authenticity of documents that, *standing on their own,* do not appear genuine.[259]

---

[256] *See, e.g.*, *id.* at 9 (Analysis of Employee Philip Aleman).

[257] 8 U.S.C. § 1324a(b)(1)(A).

[258] The attestation paragraph on the Form I-9 also states that in addition to being genuine, the documents "relate to the employee" tendering them.   Doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form I-9) ECF 10.   This requirement ensures that the name and any picture on the document matches the employee, preventing employers from accepting genuine documents that clearly do not belong to the employee.   To suggest that it creates an affirmative duty to make further inquiries is to contradict the plain language of the verification provision, as discussed *supra*.

[259] In his review of 840 Maples Industries personnel files, Mallon identified 139 employees to be unauthorized to work in the United States.   Doc. no. 78-13 (Expert Report of Edward Mallon), at 6.   In almost every instance, his determination was based on some inconsistency between the documents and information in the employee personnel file.   His report only identifies 18 instances of documents that have some defect on their face.   *See id.* at 6-69.   Of those, 5 are incorrectly posed photographs, and 13 are persons claiming nonexistent immigration classifications.   *Id.*   Under

The next type of evidence relied upon by plaintiffs is more convincing than Mallon's conclusions regarding inconsistency across documents. Plaintiffs presented evidence of specific documents that, on their face, actually fail to meet the requirement that they reasonably appear to be genuine. Perhaps the most egregious example is that of Ismael Burgos Diaz. Burgos presented a Social Security card and a Tennessee non-driving identification card. The identification card listed his address as "80 Mimosa Road, *Chatanoga*, TN."[260]   Although defendant Howard Moore testified that the misspelling would not raise a red flag in his mind because "there could be such a place," or it could have been an abbreviation,[261] this court finds that such explanations fall short of the objective reasonability standard of the verification provision. A Tennessee identification card listing an address in "Chatanoga" does not reasonably appear on its face to be genuine.

Another case of facially questionable documents is that of Juan Irgo. Irgo wrote his name on the Form I-9, but produced a North Carolina identification card and Social Security card bearing the name "Juan Antonio Garza, Jr.[262]  Although the two

---

*Collins Foods*, the latter group arguably does not fall within the definition of facially invalid documents.

[260] *See* doc. no. 78-40 (Form I-9 and Documents, Ismael Burgos Diaz) (emphasis supplied).

[261] Doc. no. 78-2 (Howard Moore Dep., May 25, 2010), at 69.

[262] Doc. no. 78-7 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 67 (Form I-9 and Documents, Juan Irgo) ECF 8-9.

documents appear facially valid on their own, they are inconsistent when considered together with the Form I-9.   Unlike evidence of inconsistency between an employment application and a document, the inconsistency with the Form I-9, *onto which the information from the documents is copied*, is much more suspicious.   In *Collins Foods*, the Ninth Circuit held that a Social Security card for an "Armando Rodriquez" reasonably appeared to be genuine on its face, even when presented simultaneously with a driver's license for "Armando Rodriguez." *Collins Foods*, 948 F.2d at 553.   If the names on the documents and Form I-9 presented by Juan Irgo were as similar as "Rodriguez" and "Rodriquez," the documents arguably could reasonably appear to be genuine on their face.   However, the difference between "Irgo" and "Garza" is too great to reach such a conclusion here.   Thus, plaintiffs have produced evidence that, at least in some individual cases, defendant Gina Mateo failed to comply with the verification provision by approving documents that do not reasonably appear to be genuine on their face.

In sum, the evidence in the record, when viewed in the light most favorable to plaintiffs, suggests that Mateo's inspection of the documents may not have met even the low standard set by the verification provision.   That is, even though many of the documents may have appeared genuine on their face, Mateo never actually inspected them to confirm that facial validity.   Mateo's testimony regarding the process of

collecting, photocopying, and inspecting the documents is disjointed and somewhat contradictory.   She testified that she looked only at the photographs on the identification cards, but also that the purpose of inspection is making sure the names and dates of birth match the information the employees provide.[263]   Her testimony regarding the time at which the documents were copied and returned to the new employees was also murky.[264]   With such an unclear picture of what the inspection process at Maples Industries actually entailed, it would be improper for the court to determine that Mateo satisfied even the low burden of the verification provision. There is a genuine issue of material fact regarding her compliance with that requirement.   Even if an appellate court should later hold that Mateo did comply with the verification provision, the pre-signing of the I-9 Forms, discussed in the next subpart of this opinion, establishes a violation of a RICO predicate statute.

### b.   Compliance with the attestation provision

The RICO "attestation provision," 18 U.S.C. § 1546(b), creates criminal liability for anyone using a "false attestation" to satisfy a requirement of § 1324a(b).   18 U.S.C.   §   1546(b)(3).     While   the   verification   provision   explicitly   limits   the

---

[263] *Compare* doc. no. 78-10 (Regina Mateo Dep., May 24, 2010), at 152 ("Q:  That's all you look to see is if the picture matches the face right?"  A:  Yes.") *with id.* at 121 ("Q:  And what's the purpose of looking at the documents?  What is your knowledge of that; why is that required?"  A: Just to make sure it's the person's picture on there and their information, their name and date of birth.").

[264] *See generally id.* at 120, 124-25.

examination required of documents, the language of the attestation provision makes clear the broad scope of liability — that is, any "false attestation" is a violation of the statute, even if the inspection of the documents was adequate to satisfy the verification provision.

In addition to deficiencies with individual documents, plaintiffs point to Gina Mateo's act of pre-signing of I-9 Forms in batches of fifty as support for the argument that her attestations were false in violation of § 1546(b)(3).  Plaintiffs argue that, by signing the forms before filling them with the employees' information, Mateo made false attestations.  Defendants counter by arguing that Mateo's attestations did not become effective until she dated them:  an action she did not take until the verification process was complete.  In other words, pre-signing cannot constitute a false attestation, because it is not any attestation at all.  Mateo pre-signed hundreds of I-9 Forms over the course of the relevant period.[265]  Thus, if pre-signing constitutes false attestation, she undoubtedly engaged in a pattern of racketeering activity.

In stating that false attestation is punishable by fine or imprisonment, § 1546(b) does not define the requirements for a valid attestation, or provide a definition of "false."   Section 1324a(b) does little to clarify the picture, adding only the requirement that the attestation be "under penalty of perjury and on a form designated

---

[265] *Id.* at 101-04.

or established by the Attorney General by regulation."  8 U.S.C. § 1324a(b)(1)(A).

Defendants cite 28 U.S.C. § 1746 in support of their argument that a signature

without a date is not an attestation and, thus cannot be a *false* attestation.  That statute

provides that an "unsworn declaration, certificate, verification, or statement" is

equally as effective as a sworn one, provided it is "in writing of such person which

is subscribed by him, as true under penalty of perjury, and dated . . . ."  28 U.S.C. §

1746.  The statute goes on to prescribe the general form required:  "I declare (or

certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on (date).  (Signature)."  *Id.*

The attestation clause on the Form I-9 is essentially a wordier version of the form

prescribed in § 1746, including statements regarding the penalty of perjury and the

truth of the information on the form.[266]  The form also calls for the attesting person

to date it.  Thus, the attestation portion of the Form I-9 is not complete until it is both

signed and dated.  However, defendants' interpretation of the attestation requirements

turns them on their head.  Rather than requiring the person attesting to sign and date

---

[266] The full text of the attestation clause reads:

> I attest, under penalty of perjury, that I have examined the document(s)
> presented by the above-named employee, that the above-listed document(s) appear
> to be genuine and relate to the employee named, that the employee began
> employment on (*month/day/ye*ar) _____ and that to the best of my knowledge the
> employee is authorized to work in the United States.

Doc. no. 78-6 (Exhibits to Howard Moore Dep., May 25, 2010) at Ex. 33 (Blank Form I-9) ECF 10.

the form contemporaneously with the attested event, defendants' construction would allow a premature signature (an incomplete and invalid attestation) to become a valid attestation by the mere act of dating it contemporaneously with the later-occurring event. Such an interpretation undermines the reliability presumably created by requiring a signature *and* a date. Defendants' argument is unconvincing, and the evidence shows that defendant Gina Mateo did falsely attest by pre-signing hundreds of I-9 Forms.

### c. Damages and proximate cause

In order to maintain a civil RICO claim, a plaintiff must demonstrate that he or she suffered damages actually and proximately caused by the defendants' actions. The RICO statute provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ." 18 U.S.C. § 1964(c) (alteration supplied). The Supreme Court has interpreted that language to require proximate causation. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Here, plaintiffs allege that Mateo's false attestations on hundreds of I-9 Forms caused a decrease in their wages. They argue that the influx of illegal immigrants to the Maples Industries workforce made it possible for the company to meet its staffing needs without increasing wages. In response, defendants argue that the act of falsely

attesting is too far attenuated from plaintiffs' wages to proximately cause a wage reduction.

Plaintiffs argue that the Eleventh Circuit's decision in *Williams* "held that . . . false attestation violations under RICO proximately cause depressed wages."[267] *Williams* is better characterized as holding that false attestations *may* proximately cause depressed wages, but not that they inevitably do.  In that case, the Eleventh Circuit ruled that the allegations of the plaintiffs' complaint were sufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Williams*, 465 F.3d at 1288-89 ("Given these allegations, which we must assume are true at this Rule 12(b)(6) stage of the litigation, it is clear that the plaintiffs have alleged a sufficiently direct relation between their claimed injury and the alleged RICO violations.").  The Eleventh Circuit focused the bulk of its discussion on the allegations that the defendant in that case violated § 1324(a), but also concluded that the "plaintiffs' allegations are neither indirect nor too remote to satisfy Georgia's proximate-cause requirement under state-law RICO," for which false attestation was the only possible predicate act.  *Id.* at 1294.

This action, unlike *Williams*, is before the court at the summary judgment stage. Therefore, plaintiffs' *allegation* of a sufficiently direct relation between false

---

[267] Doc. no. 77 (Brief in Opposition to Summary Judgment), at 24 (citing *Williams*, 465 F.3d at 1288-89).

attestations and depressed wages is not sufficient; there must be *evidence in the record* to support proximate causation.  Here, there is evidence that Mateo falsely attested in completing hundreds of I-9 Forms.[268]   However, plaintiffs have not presented any admissible evidence of damages.  Thus, they cannot possibly establish a link between false attestations and any harm they may have suffered.  The only evidence plaintiffs offered in support of the existence of damages and their causation theory was the expert report of Dr. George Borjas.  However, as explained in Part II(C) of this opinion, *supra*, that report is due to be stricken.  Without that report, plaintiffs cannot establish the proximate cause element of their claims.  Therefore, summary judgment is due to be granted in favor of defendants on all claims.

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion to strike is due to be GRANTED in part and DENIED in part.  Defendants' motion for summary judgment is also due to be GRANTED, and all claims dismissed with prejudice.  Plaintiffs' motion for class certification will be DENIED as moot.

DONE this 28th day of September, 2012.

---

[268] *See* Part III(C)(2)(b) of this opinion, *supra*.

United States District Judge